**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PUBLIC WATCHDOGS, a California
501(c)(3) corporation,
*Plaintiff-Appellant,*

v.

SOUTHERN CALIFORNIA EDISON
COMPANY; SAN DIEGO GAS &
ELECTRIC COMPANY; SEMPRA
ENERGY; HOLTEC INTERNATIONAL;
U.S. NUCLEAR REGULATORY
COMMISSION,
*Defendants-Appellees.*

No. 19-56531

D.C. No.
3:19-cv-01635-
JLS-MSB

OPINION

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted June 3, 2020
Pasadena, California

Filed December 29, 2020

Before:  Johnnie B. Rawlinson and N. Randy Smith, Circuit Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge N. Randy Smith

**SUMMARY**[**]

**Hobbs Act**

The panel affirmed the district court's dismissal of a complaint for lack of subject-matter jurisdiction under the Administrative Orders Review Act, frequently referred to as the Hobbs Act.

Under the Hobbs Act, courts of appeals have exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the United States Nuclear Regulatory Commission made reviewable by section 2239 of title 42.  Section 2239 also provides for Hobbs Act review of "[a]ny final order entered in any proceeding," 42 U.S.C. § 2239(b)(1), "for the granting, suspending, revoking, or amending of any license . . . and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees," *id.* § 2239(a)(1)(A).

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Plaintiff-Appellant Public Watchdogs, a non-profit corporation advocating for public safety, brought an action against the NRC and others alleging claims related to the decommissioning of two nuclear generating units at San Onofre Nuclear Generating Station (SONGS). In 2015, after the units ceased operating, the NRC approved changes to the Facility Operating Licenses by amending the licensing agreements with Southern California Edison Company and San Diego Gas & Electric Company. The 2015 License Amendments required the utility defendants to take actions necessary to decommission the plants and continue to maintain the facility, including the storage, control and maintenance of the spent nuclear fuel, in a safe condition. As part of the decommissioning plan, the utility defendants elected to use private defendant Holtec International's HI-STORM UMAX Canister Storage System ("Holtec System"), a canister-based spent nuclear fuel storage system that had been approved for the storage of spent nuclear fuel by the NRC in a Certificate of Compliance. Public Watchdog sought to enjoin the defendants' allegedly negligent decommissioning activities at SONGS and challenged, among other things, the NRC's selection of Holtec International as the supplier of the spent nuclear fuel storage system and the NRC's grant of the 2015 License Amendments.

The panel held that the Hobbs Act must be interpreted broadly to encompass not only all final NRC actions in licensing proceedings, but also all decisions that are preliminary, ancillary, or incidental to those licensing proceedings. Because Public Watchdogs's complaint challenged final orders of the NRC related to licensing, the NRC's enforcement decisions related to NRC licenses and certifications, and conduct licensed or certified by the NRC,

Public Watchdogs's action fell squarely within the scope of the Hobbs Act.

Specifically, the panel held that the district court correctly determined that Public Watchdogs's claim under the Administrative Procedure Act ("APA") directly challenged the grant of the 2015 License Amendments and the Certificate of Compliance for the Holtec System. The panel held that the 2015 License Amendments and the Certificate of Compliance were final orders of the NRC and related to the grant or amendment of a license or the issuance or modification of rules and regulations dealing with the activities of licensees. Accordingly, under the Hobbs Act, the court of appeals had exclusive jurisdiction to enjoin, set aside, suspend or to determine the validity of those orders. The district court therefore correctly found that it lacked subject-matter jurisdiction over Public Watchdogs's claim brought under the APA against the NRC to the extent it challenged the 2015 License Amendments and the Certificate of Compliance for the Holtec System.

The panel rejected Public Watchdog's argument that the district court  had subject-matter jurisdiction over its APA claim because other agency actions, including a decision exempting Holtec from certain pre-approval requirements for canister design changes, fell outside the scope of the Hobbs Act. The panel held that even assuming Public Watchdogs's APA claim did not challenge the grant of the 2015 License Amendments or the Certificate of Compliance for the Holtec System, Public Watchdogs's APA claim related to other agency actions still fell within the scope of the Hobbs Act because it challenged the NRC's enforcement "decisions *not* to suspend" a license or licensed operations and sought relief

that should have first been pursued before the NRC pursuant to 10 C.F.R. § 2.206.

The panel held that Public Watchdogs's claims against private defendants, Holtec International and the utility defendants, fell within the scope of the Hobbs Act. The panel held that despite Public Watchdogs's artful pleading, it was clear its claims against these private defendants were an attempt to challenge the 2015 License Amendments, the Certificate of Compliance for the Holtec System, and actions taken by the licensees under the authority of both of those final NRC orders. Public Watchdogs, therefore, could not avoid the Hobbs Act's exclusive avenue of judicial review by pleading its challenge to the 2015 License Amendments and the Certificate of Compliance for the Holtec System as a public liability action under the Price-Anderson Act, or as a public nuisance claim or a strict products liability claim under California law.

---

**COUNSEL**

Eric J. Beste (argued) and Charles G. La Bella, Barnes & Thornburg LLP, San Diego, California, for Plaintiff-Appellant.

Justin D. Heminger (argued), Senior Litigation Counsel; Eric Grant, Deputy Assistant Attorney General; Jeffrey Bossert Clark, Assistant Attorney General; Andrew P. Averbach, Solicitor, and James E. Adler, Senior Attorney, U.S. Nuclear Regulatory Commission; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; for Defendant-Appellant U.S. Nuclear Regulatory Commission.

James R. Evans Jr. (argued), Edward J. Casey, and Alexander Akerman, Alston & Bird LLP, Los Angeles, California, for Defendants-Appellees Southern California Edison Company, San Diego Gas & Electric Company, Sempra Energy, and Holtec International.

## OPINION

N.R. SMITH, Circuit Judge:

Under the Administrative Orders Review Act—frequently referred to as the Hobbs Act—courts of appeals have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [United States Nuclear Regulatory Commission ("NRC")] made reviewable by section 2239 of title 42." 28 U.S.C. § 2342(4). Section 2239 also provides for Hobbs Act review of "[a]ny final order entered in any proceeding," 42 U.S.C. § 2239(b)(1), "for the granting, suspending, revoking, or amending of any license . . . and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees," *id.* § 2239(a)(1)(A). Because the scope of the Hobbs Act must be read broadly, the Hobbs Act thus encompasses not only all final NRC orders in licensing proceedings, but all NRC decisions that are preliminary, ancillary, or incidental to those licensing proceedings. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 737, 743 (1985); *Gen. Atomics v. U.S. Nuclear Regulatory Comm'n*, 75 F.3d 536, 539 (9th Cir. 1996).

Plaintiff–Appellant Public Watchdogs, a non-profit corporation advocating for public safety, appeals the district court's dismissal with prejudice of its first amended

complaint for a lack of subject-matter jurisdiction under the Hobbs Act. Because Public Watchdogs's complaint challenges final orders of the NRC related to licensing, NRC enforcement decisions related to NRC licenses and certifications, and conduct licensed or certified by the NRC, Public Watchdogs's action falls squarely within the scope of the Hobbs Act. Therefore, we affirm the district court's dismissal of Public Watchdogs's first amended complaint with prejudice for a lack of subject-matter jurisdiction under the Hobbs Act.

## I.  BACKGROUND

### A.  The NRC Regulates the Construction and Operation of Nuclear Power Plants and Spent Fuel Storage Facilities, and the Storage of Spent Nuclear Fuel

The NRC is an independent regulatory commission established by Congress in the Energy Reorganization Act of 1974 ("ERA"). *See* 42 U.S.C. § 5841(a)(1). The ERA transferred "all the licensing and related regulatory functions of the Atomic Energy Commission" to the NRC. *Id.* § 5841(f). Under the Atomic Energy Act of 1954 ("AEA"), the NRC is tasked with licensing and regulating civilian storage and use of radioactive material to promote the common defense and security and public health and safety. *See id.* § 2201(b), (h), (i); *see also id.* §§ 2131–33. "Consistent with its administrative mandate, the NRC is empowered to promulgate rules and regulations governing the construction and operation of nuclear power plants." *Cnty. of Rockland v. U.S. Nuclear Regulatory Comm'n*, 709 F.2d 766, 769 (2d Cir. 1983); *see also* U.S. Nuclear Regulatory Comm'n, NUREG-1350, vol. 31, 2019–2020 Information Digest 34 (2019) [hereinafter NRC Information Digest] ("The

NRC establishes requirements for the design, construction, operation, and security of U.S. commercial nuclear power plants."). Accordingly, the NRC has promulgated extensive regulations governing the agency's issuance of licenses to construct and operate nuclear power plants and fuel storage facilities and to possess spent nuclear fuel. *See* 10 C.F.R. Parts 50, 52, 72.

If a person's interests will be affected by an NRC proceeding "for the granting, suspending, revoking, or amending of any license or construction permit" or by a "proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees," then that person may request a hearing before the NRC. 42 U.S.C. § 2239(a)(1)(A). However, the hearing request must state "that one or more of the acceptance criteria in the . . . license ha[s] not been, or will not be met, and the specific operational consequences of nonconformance that would be contrary to providing reasonable assurance of adequate protection of the public health and safety." *See id.* § 2239(a)(1)(B)(ii). Regardless of whether a hearing is requested or actually held, the NRC's final order in these proceedings is subject to initial judicial review in the courts of appeals under the Hobbs Act. *See id.* § 2239(b)(1); 28 U.S.C. § 2342(4); *see also Lorion*, 470 U.S. at 737 ("Congress intended to provide for initial court of appeals review of all final orders in licensing proceedings whether or not a hearing before the [NRC] occurred or could have occurred.").

Aside from the NRC's licensing and rule-making responsibilities, the agency is also responsible for: (1) "conducting criminal, civil, and administrative investigations of alleged violations by NRC licensees"; (2) "inspecting NRC licensees to ensure adequate

performance of safety and security programs"; and (3) "enforcing NRC regulations and the conditions of NRC licenses and imposing, when necessary, civil sanctions and penalties." NRC Information Digest at 5; *see also* 42 U.S.C. § 2282 (authorizing the NRC to issue civil penalties for licensing or certification violations). Relatedly, the NRC may issue orders modifying, suspending, or revoking a license to remedy license violations or other "potentially hazardous conditions." *See* 10 C.F.R. § 2.202. The NRC regulations also provide a mechanism through which "[a]ny person" may file a request with the NRC to "institute a proceeding pursuant to § 2.202 to modify, suspend, or revoke a license, or for any other action as may be proper." 10 C.F.R. § 2.206(a).

The NRC also regulates the storage of spent nuclear fuel ("SNF"), which is the radioactive byproduct that results from the "burning" of nuclear fuel (i.e., uranium fuel rods bundled into fuel assemblies) in nuclear reactors. *See* U.S. Nuclear Regulatory Comm'n, NUREG/BR-0528, Safety of Spent Fuel Storage at 1 (April 2017) [hereinafter NRC Spent Fuel Storage]; *see generally* 10 C.F.R. Part 72. After SNF is removed from a nuclear reactor, it is first stored in deep pools of continuously flowing water that cool the spent fuel. NRC Information Digest at 70–71; NRC Spent Fuel Storage at 1. Once the SNF has cooled sufficiently, it is often transferred into dry casks. Information Digest 71–72; NRC Spent Fuel Storage at 1–2. Dry casks are "typically made of leak-tight, welded, and bolted steel and concrete surrounded by another layer of steel or concrete." NRC Information Digest at 68. There are two basic designs of dry casks that are widely used to store SNF: (1) a canister-based system that utilizes an inner steel canister that contains the SNF that is then surrounded by three feet or more of steel and concrete; and (2) a "bolted cask system" that does not have an inner canister but instead

encases the SNF in "thick steel shells, sometimes with several inches of radiation shielding inside." NRC Spent Fuel Storage at 2. The dry casks are normally stored on site in facilities called independent spent fuel storage installations ("ISFSI"). NRC Information Digest at 68.

The NRC regulates the on-site storage of SNF in one of two ways: (1) it grants a site-specific license based on a safety review of the technical requirements and operating conditions for the specific ISFSI; or (2) it issues a general license that authorizes the licensee to store SNF in dry storage casks certified by the NRC for the storage of SNF. *See id.*; *see also* 10 C.F.R. § 72.210 (issuing a general license for the storage of spent fuel in an ISFSI for individuals "authorized to possess or operate nuclear power reactors under" 10 C.F.R. Parts 50 or 52). The NRC regulations impose several conditions on a general licensee, including requiring the licensee to use only "casks approved under the provisions of this part" and ensuring the cask used by the licensee "conforms to the terms, conditions, and specifications of a [Certificate of Compliance] or amended [Certificate of Compliance] listed in § 72.214." 10 C.F.R. § 72.212(a)(2), (b)(3). Once the NRC approves a dry cask for the storage of SNF under the specific conditions noted in the Certificate of Compliance, it adds the approved cask system to a list of approved storage systems. *See id.* § 72.214 (listing approved casks for storage of SNF).

Prior to the NRC's approval of a cask for storage of SNF in a Certificate of Compliance, the agency subjects the storage system to a rigorous review process, including public scrutiny through notice-and-comment rule making. *See, e.g.*, *id.* § 72.232 (requiring the applicant for a Certificate of Compliance to: (1) allow the NRC "to inspect the premises

and facilities where a spent fuel storage cask is designed, fabricated, and tested"; (2) "make available to the NRC for inspection . . . records kept by them pertaining to the design, fabrication, and testing of spent fuel storage casks"; and (3) "perform . . . tests that the [NRC] deems necessary or appropriate"); *id.* § 72.236 (listing the specific requirements for spent fuel storage casks). Ultimately, the NRC only certifies for use those systems that meet certain requirements for safely storing SNF. *See id.* § 72.238 (providing that a Certificate of Compliance for a storage cask will be issued by the NRC if the requirements in § 72.236(a) though (i) are satisfied).

Thus, under the terms of its operating license and the relevant Certificate of Compliance, an NRC nuclear power reactor licensee may store SNF on site in an ISFSI in a dry storage cask certified by the NRC. *See id.* §§ 72.210, 72.212.

**B. The NRC's Grant of a License Amendment to the SONGS Licensees and Certification of Holtec International's HI-STORM UMAX Canister Storage System for the Storage of Spent Nuclear Fuel at SONGS**

In August 1963, Congress enacted Public Law 88-82 that authorized the "construction, operation, maintenance, and use" of a nuclear power plant on the Camp Pendleton military base in Southern California. Act of July 30, 1963, Pub. L. No. 88-83, 77 Stat. 115. Thereafter, three nuclear electric generating units were constructed and operated at San Onofre Nuclear Generating Station ("SONGS") pursuant to permits and licenses issued by the NRC. The NRC issued three separate Facility Operating Licenses—one for each unit—to Southern California Edison Company ("Edison") and San

Diego Gas & Electric Company ("SDG&E"), the co-licensees of SONGS.[1] All three licenses permitted the Utility Defendants to possess and store spent fuel at SONGS.

The first nuclear generating unit operated from 1968 until 1992. The second and third units operated from 1983 and 1984, respectively, until both units ceased operation and began the decommission process in 2013. In 2015, after the Utility Defendants ceased operation of the second and third nuclear generating units, the NRC approved changes to the Facility Operating Licenses for Units 2 and 3 by amending the license agreements ("2015 License Amendments"). The 2015 License Amendments require the Utility Defendants to "[t]ake actions necessary to decommission the plant and continue to maintain the facility, including . . . the storage, control and maintenance of the spent fuel, in a safe condition."

The NRC's review of the 2015 License Amendments was open to public comment and intervention. *See* Biweekly Notice, Applications and Amendments to Facility Operating Licenses and Combined Licenses Involving No Significant Hazards Considerations, 79 Fed. Reg. 55,507, 55,508, 55,513–14 (Sept. 16, 2014) (soliciting comments on the NRC's determination that the 2015 License Amendments involved "no significant hazards consideration" and informing the public they could request a hearing before the NRC). However, the NRC received no comments. *See* Biweekly Notice; Applications and Amendments to Facility Operating Licenses and Combined Licenses Involving No

---

[1] Edison, SDG&E, and SDG&E's parent company, Sempra Energy ("Sempra"), are collectively referred to as the "Utility Defendants."

Significant Hazards Considerations, 80 Fed. Reg. 46,345, 46,354 (Aug. 4, 2015).

Although the SNF at SONGS had historically been stored in wet-storage pools, the Utility Defendants' decommissioning plan required the SNF to be buried in dry casks in the SONGS ISFSI. The Utility Defendants elected to use Holtec International's ("Holtec") HI-STORM UMAX Canister Storage System ("Holtec System"), a canister-based SNF storage system that had been approved for the storage of SNF by the NRC in a Certificate of Compliance. The Holtec System consists of three components: "(1) interchangeable multi-purpose canisters . . . , which contain the fuel; (2) underground Vertical Ventilated Modules . . . , which contain[] the [canisters] during storage; and (3) a transfer cask . . . , which contains the [canisters] during loading, unloading and transfer operations."

Like the 2015 License Amendments, the public had the opportunity to provide comments concerning the NRC's evaluation and approval of the Holtec System. *See* List of Approved Spent Fuel Storage Casks: Holtec International HI-STORM Underground Maximum Capacity Canister Storage System, Certificate of Compliance No. 1040, 80 Fed. Reg. 12,073, 12,074–76 (Mar. 6, 2015) (codified at 10 C.F.R. § 72.214) (responding to public comments related to the addition of the Holtec System to the list of approved spent fuel storage casks); *see also* List of Approved Spent Fuel Storage Casks: Holtec International HI-STORM UMAX Canister Storage System, Certificate of Compliance No. 1040, Amendment No. 1, 80 Fed. Reg. 35,829, 35,829–30 (June 23, 2015) (codified at 10 C.F.R. § 72.214) (soliciting public comments related to the direct final rule amending the certificate of compliance to include the

"seismically enhanced version of the HI-STORM UMAX Canister Storage System"); List of Approved Spent Fuel Storage Casts: Holtec International HI-STORM UMAX Canister Storage System; Certificate of Compliance No. 1040, Amendment No. 2, 81 Fed. Reg. 73,335, 73,336 (Oct. 25, 2016) (codified at 10 C.F.R. § 72.214) (soliciting public comments related to the direct final rule amending the Certificate of Compliance to include new fuel types).

The Preliminary Safety Evaluation Report, issued in connection with the Certificate of Compliance for the Holtec System, documented the NRC's review and evaluation of the Holtec System. Therein, the NRC considered the Holtec System's shielding and radiation protection; its susceptibility to chemical, galvanic, or other reactions; and its potential performance in the event of an accident. Ultimately, the NRC concluded that the activities authorized by the Holtec System Certificate of Compliance could "be conducted without endangering the health and safety of the public" and could "be conducted in compliance with the applicable regulations of [10 C.F.R. Part 72]."

In response to public comments, the NRC reiterated that "the design [of the Holtec System] is robust, and contains numbers of layers of acceptable confinement systems in compliance with [10 C.F.R. Part 72] requirements." 80 Fed. Reg. at 12,074–75. The NRC also emphasized that it "evaluated the susceptibility to and effects of stress corrosion cracking and other corrosion mechanisms on safety significant systems" and concluded that the Holtec System "will safely store SNF and prevent radiation releases and exposure consistent with regulatory requirements." *Id.* at 12,075.

## C.  The Decommissioning of SONGS

On August 29, 2019, Public Watchdogs brought suit against Edison, SDG&E, Sempra, Holtec, and the NRC (collectively, "Defendants"), seeking to enjoin Defendants' allegedly negligent decommissioning activities at SONGS. In its First Amended Complaint ("FAC"), Public Watchdogs challenges the NRC's selection of Holtec as the supplier of the SNF storage system and the NRC's grant of the 2015 License Amendments. For example, Public Watchdogs alleges that: (1) the NRC's selection of Holtec as the supplier of the SNF storage system was done recklessly or in conscious disregard for the safety and competency issues that have surrounded Holtec for years; and (2) the NRC's grant of the 2015 License Amendments was arbitrary, capricious, or otherwise unlawful.

Public Watchdogs's allegations also challenge the Holtec SNF canisters that were certified for the storage of SNF by the NRC in a Certificate of Compliance. In fact, Public Watchdogs alleges that: (1) the design of the Holtec SNF canisters "deviates from the acceptable minimum safety thresholds required for the design and manufacture of nuclear waste storage containers"; and (2) Holtec made changes to the design of the Holtec SNF canisters after the NRC's certification of the Holtec System without the authorization of the NRC and those design changes rendered several of the Holtec SNF canisters defective.[2] Despite the NRC learning of the allegedly defective Holtec SNF canisters, Public Watchdogs argues the NRC "failed to act" and permitted the

---

[2] Public Watchdogs complains that the NRC declined to impose a civil fine on Holtec for its failure to seek pre-authorization of the design change that allegedly rendered several Holtec SNF canisters defective.

Utility Defendants to continue loading the Holtec SNF canisters.

Public Watchdogs's FAC also complains of the Utility Defendants' allegedly negligent decommissioning conduct, including allegations that: (1) the Utility Defendants negligently "gouged" a number of Holtec SNF canisters as they buried them in the SONGS ISFSI; and (2) many Holtec SNF canisters were negligently scratched during transportation to the SONGS ISFSI. Public Watchdogs's allegations related to decommissioning conduct also highlight two instances (one in July 2018 and one in August 2018) where the Utility Defendants mishandled loaded Holtec SNF canisters as they were transferred into the SONGS ISFSI and subsequently failed to report those incidents to the NRC.

In response to the August incident where the Utility Defendants mishandled a loaded Holtec SNF canister, the NRC issued an Inspection Charter for SONGS. The scope of the special inspection sought to evaluate, *inter alia*, the adequacy of the Utility Defendants' loading procedures, corrective actions, and reporting procedures. In the Inspection Charter, the NRC noted that the Utility Defendants voluntarily committed to not resuming their SNF transfer operations until the NRC's inspection and review was complete. Public Watchdogs argues, however, that the NRC should have ordered the Utility Defendants to cease SNF transfer operations.

Public Watchdogs also points to a number of NRC issued Inspection Reports that identified various violations related to the Utility Defendants' and Holtec's decommissioning conduct at SONGS. For example, in March 2019, the NRC issued a Notice of Violation and NRC Special Inspection

Report to Edison for two safety violations that occurred at SONGS on August 3, 2018, the date of the second incident where the Utility Defendants mishandled a loaded Holtec SNF canister as it was loaded into the ISFSI. The two violations allegedly related to the Utility Defendants "failure to make certain that safety equipment was operating" and their "failure to report the safety incident to the NRC." Ultimately, the NRC imposed on Edison a $116,000 fine.

Finally, on July 15, 2019, the Utility Defendants informed the public that they were resuming the movement of SNF from wet storage to the Holtec SNF canisters and were resuming the burial of the canisters in the SONGS ISFSI.

## D. Procedural History

Based on the above allegations, Public Watchdogs asserted: (1) the NRC violated the Administrative Procedure Act, 5 U.S.C. §§ 702 *et seq.*; (2) Edison, SDG&E, Sempra, and Holtec (collectively, "the Private Defendants") violated the Price–Anderson Act, 42 U.S.C. § 2210(n)(2); (3) the Private Defendants violated California's public nuisance laws, Cal. Civ. Code §§ 3479–80; and (4) Holtec was liable under a strict products liability theory. Public Watchdogs also filed a motion for preliminary injunction and a temporary restraining order that sought to restrain Defendants from transferring additional SNF into the Holtec SNF canisters and, in turn, the SONGS ISFSI.

Defendants opposed Public Watchdogs's request for a temporary restraining order and moved to dismiss the FAC for a lack of subject-matter jurisdiction and for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

After commencing proceedings in the district court, Public Watchdogs also filed a petition with the NRC pursuant to 10 C.F.R. § 2.206, requesting the NRC suspend all decommissioning operations at SONGS and require Edison and SDG&E to submit an amended decommissioning plan that accounted for the long term storage of SNF at SONGS. In addition to arguing the requested relief was appropriate, because the NRC permitted Edison and SDG&E "to implement their decommissioning plan based on the unreasonable assumption that spent nuclear fuel will be stored at SONGS only temporarily," Public Watchdogs also argued it was entitled to the requested relief, because Edison and SDG&E's burial of SNF at SONGS posed "an imminent threat to public safety."

Public Watchdogs's allegations supporting its petition with the NRC pursuant to 10 C.F.R. § 2.206 closely mirror those allegations in the FAC. For example, Public Watchdogs alleges in the § 2.206 petition that the "Holtec dry storage canisters . . . are defective and unfit for the indefinite storage of [SNF]" and that Holtec "secretly modified the design and manufacture of the canisters" so that they are no longer "design[ed], manufacture[d], [or] supplie[d]" in conformity with the Certificate of Compliance approving their use. Public Watchdogs's petition also complains that, due in part to the defective design of the Holtec System, "extensive gouging [of the canisters] occur[red] during routine loading into the storage system" and there is no way to monitor, inspect, or fix the canisters once they are in the ground. As with the FAC, Public Watchdogs alleges in the petition that Edison and SDG&E "negligently gouged and then buried . . . fully loaded [Holtec] canisters at SONGS" and "many (if not all) of the canisters were negligently scratched during transportation to the ISFSI." Also similar to the FAC, Public

Watchdogs's petition complains of Edison and SDG&E's failure to disclose the two mishandling incidents discussed above and the NRC's inadequate response thereto.

While Defendants' motions to dismiss in the instant suit and the § 2.206 petition before the NRC were still pending, Public Watchdogs filed an emergency petition for writ of mandamus with the Ninth Circuit Court of Appeals that sought to immediately suspend decommissioning operations at SONGS until the NRC resolved Public Watchdogs's pending § 2.206 petition. We denied the writ of mandamus, reasoning that "the petition requesting suspension ha[d] only been before the NRC for a short period of time, and the NRC ha[d] represented to the Court in its response that it [was] processing the petition and ha[d] not engaged in delay." *In re Public Watchdogs*, No. 19-72670, Dkt. No. 19, at 4.

On December 3, 2019, the district court granted Defendants' motions to dismiss, denied Public Watchdogs's motion for preliminary injunction, and dismissed Public Watchdogs's FAC with prejudice. The district court held Public Watchdogs had standing to pursue injunctive relief against the Private Defendants, reasoning the allegations in the FAC were sufficient to allege Article III standing and satisfy the injury-in-fact requirement, because the allegations tended to show "there is a 'credible threat' that a probabilistic harm will materialize."[3] *Pub. Watchdogs v. S. Cal. Edison Co.*, No. 19-CV-1635 JLS (MSB), 2019 WL 6497886, at *7 (S.D. Cal. Dec. 3, 2019) (unpublished) (quoting *Nat. Res.*

---

[3] The district court also concluded that Public Watchdogs did not have standing to contest the NRC's grant of two exemptions related to the use of decommissioning trust funds and certain insurance requirements. Public Watchdogs does not challenge these conclusions on appeal.

*Def. Council v. U.S. Envtl. Prot. Agency*, 735 F.3d 873, 878 (9th Cir. 2013)).

The district court next concluded that all of Public Watchdogs's claims challenged NRC decisions that fell within the scope of the Hobbs Act, thereby depriving it of subject-matter jurisdiction over the action. *See id.* at *8–12. With respect to Public Watchdogs's claim against the NRC, the district court found it lacked subject-matter jurisdiction: (1) because the claim challenged the grant or amendment of 2015 License Amendments and the Certificate of Compliance for the Holtec System (both final orders of the NRC relating to the grant or amendment of a license for the purpose of the Hobbs Act); and (2) because the claim's challenge to "the Other Agency Actions" touched upon "issues preliminary or ancillary to" the 2015 License Amendments and the Certificate of Compliance for the Holtec System. *Id.* at *9–10.

Similarly, with respect to Public Watchdogs's various claims against the Private Defendants, the district court determined it lacked subject-matter jurisdiction, because all of Public Watchdogs's claims "trace[d] back to actions that were taken pursuant to or that were incidental to the NRC's issuance of the . . . 2015 License Amendment or the [C]ertificate of [C]ompliance for the Holtec canisters, actions that must be challenged before the Ninth Circuit pursuant to the Hobbs Act." *Id.* at *11.

After concluding it lacked subject-matter jurisdiction over the action, the district court proceeded to grant the Private Defendants' motions to dismiss for failure to state a claim, finding all of Public Watchdogs's claims against the Private Defendants were preempted or failed to allege facts sufficient

to state a claim for relief. *See id.* at \*13–18. Finally, the district court denied Public Watchdogs's motion for a preliminary injunction, because it was unlikely to succeed on the merits considering the district court lacked subject-matter jurisdiction over the action, and Public Watchdogs failed to state a plausible claim for relief. *See id.* at \*19. Public Watchdogs appealed the district court's decision to us.

After Public Watchdogs appealed the district court's order dismissing the instant action, the NRC denied Public Watchdogs's § 2.206 petition, and Public Watchdogs filed a Petition for Judicial Review directly with us challenging the NRC's denial of its § 2.206 petition.[4] *See Pub. Watchdogs v. Nuclear Regulatory Comm'n*, No. 20-70899 (9th Cir. Mar. 30, 2020).[5]

## II. STANDARD OF REVIEW

"We review de novo the district court's determination that it lacked subject matter jurisdiction because of the Hobbs Act." *Carpenter v. Dep't of Transp.*, 13 F.3d 313, 314 (9th Cir. 1994).

---

[4] While Public Watchdogs's initial § 2.206 petition was pending, Public Watchdogs filed another § 2.206 petition that sought to "immediately suspend decommissioning operations at [SONGS] Units 2 and 3 on the grounds that the present ISFSI is operating in an unanalyzed condition," i.e., a potential flooding threat.

[5] This petition is pending review.

## III. DISCUSSION

We must first determine whether the district court correctly held that it lacked subject-matter jurisdiction over Public Watchdogs's suit against Defendants. To answer this question, we must determine the appropriate scope of the Hobbs Act and then consider whether Public Watchdogs's claims challenged decisions that fall within the scope of the Hobbs Act.

### A. The Scope of the Hobbs Act Encompasses All Final Orders of the NRC Related to Licensing and All Decisions of the NRC Preliminary, Ancillary, or Incidental Thereto

"[T]he Administrative Orders Review Act, 28 U.S.C. § 2342, commonly referred to as the Hobbs Act," *Gen. Atomics*, 75 F.3d at 538, provides courts of appeals with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [NRC] made reviewable by section 2239 of title 42," 28 U.S.C. § 2342(4).[6] Section 2239, in turn, provides for Hobbs Act review of "[a]ny final order entered in any proceeding," 42 U.S.C. § 2239(b)(1), "for the granting, suspending, revoking, or amending of any license . . . , and in any proceeding for the issuance or modification of rules and

---

[6] The language of the statute "actually refers to final orders of the Atomic Energy Commission . . . , which has been abolished and whose functions have been transferred in large part to the NRC." *Gen. Atomics*, 75 F.3d at 538 n.2. However, "final orders entered by the NRC in the performance of functions transferred from the [Atomic Energy Commission] are reviewable as if they had been made by the [Atomic Energy Commission]." *Id.*

regulations dealing with the activities of licensees," *id.* § 2239(a)(1)(A).

The district court held that the Hobbs Act must be read broadly to encompass issues preliminary or ancillary to licensing proceedings. Public Watchdogs, however, argues that the Hobbs Act should be construed narrowly to exclude from district court review only actions where the NRC is called upon to grant, suspend, revoke, or amend a license. We disagree; the Hobbs Act must not be construed so narrowly.

In *Lorion*, the Supreme Court addressed whether the NRC's denial of a § 2.206 petition "should be considered a final order initially reviewable exclusively in the court of appeals" under the Hobbs Act. 470 U.S. at 734–35. After determining that the language of § 2239 was ambiguous, *id.* at 736, the Court examined certain "indicia of congressional intent" and concluded that "Congress intended to provide for initial court of appeals review of all final orders in licensing proceedings," regardless of whether a formal hearing occurred, *id.* at 737. Looking to the relevant legislative history, the Court found that the evolution of the judicial review provision, which evolved independently of the hearing provision, supported its conclusion that Congress intended "to provide for initial court of appeals review of *all* final orders in licensing proceedings," including "Commission decisions *not* to suspend, revoke, or amend" a license. *Id.* at 738–39 (first emphasis added). The Court explained that, "[w]hen Congress decided on the scope of judicial review, it did so solely by reference to the subject matter of the Commission action and not by reference to the procedural particulars of the Commission action." *Id.* at 739. Thus, after also crediting the "basic congressional choice of Hobbs Act review" in § 2239, *id.* at 740, the Supreme Court held that § 2239 vests in the federal courts of appeals initial subject-matter

jurisdiction over NRC orders denying § 2.206 petitions, *id.* at 746.

The Court bolstered its conclusion by examining the irrational consequences that would flow from the adoption of the contrary rule announced by the lower court—i.e., that § 2239 vested the courts of appeals with initial subject-matter jurisdiction only over proceedings where a hearing took place or over proceedings where a hearing could have taken place. *Id.* at 741. If initial review in the courts of appeals depended on whether a hearing actually occurred before the agency, then some licensing proceedings would be reviewed in the courts of appeals while others would not based solely on "the 'fortuitous circumstance' of whether an interested person requested a hearing." *Id.* at 741–42 (quoting *Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 196–97 (1980) (per curiam)). "Absent a far clearer expression of congressional intent," however, the Court was unwilling to sanction "such a seemingly irrational bifurcated system." *Id.* at 742 (quoting *Crown Simpson Pulp Co.*, 445 U.S. at 197). The Court further explained that, "[i]f initial review in the court of appeals hinged on whether a hearing *could have taken place* had an interested person requested one," this could "cause bifurcation of review of orders issued in the same proceeding." *Id.* at 742–43. Again, absent specific evidence of a contrary congressional intent, the Court "held that review of orders resolving *issues preliminary or ancillary to the core issue* in a proceeding should be reviewed in the same forum as the final order resolving the core issue." *Id.* at 743 (emphasis added). Ultimately, recognizing there was no "firm indication that Congress intended to locate initial [Administrative Procedure Act ("APA")] review of agency action in the district courts," the Court refused to "presume that Congress intended to depart from the sound policy of

placing initial APA review in the courts of appeals." *Id* at 745.

Relying on *Lorion*, we held in *General Atomics* that "the Hobbs Act is to be read *broadly* to encompass all final [NRC] decisions that are *preliminary or incidental* to licensing." 75 F.3d at 539 (emphasis added). We further explained that § 2239 should be "read liberally." *Id.* Thus, reading the Hobbs Act broadly and interpreting § 2239 liberally, we concluded that a district court action challenging an NRC order that a parent company must "assure the cleanup costs" of its subsidiary (the actual NRC licensee) fell within the auspices of the Hobbs Act. *Id.* at 537, 539. We explained that the goal of the NRC hearing (which had been initiated but not yet completed at the time the appellant filed the district court action) was to determine whether the parent company was, in fact, a licensee. *Id.* at 539. Such a hearing, we determined, fell squarely within the Hobbs Act, because it "directly involve[d] the granting and possible amending of the license." *Id.*[7]

---

[7] Public Watchdogs points to no caselaw of our circuit or of the Supreme Court that calls into question *General Atomic*'s conclusion—which is anchored by the Supreme Court's *Lorion* decision—that the Hobbs Act must be construed broadly to encompass decisions that are preliminary or incidental to licensing. Our circuit precedent remains binding until the Supreme Court "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Public Watchdogs principally relies on Justice Kavanaugh's concurring opinion in *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2057–67 (2019), to argue that the district court's "sweeping interpretation of the Hobbs Act" is incorrect. However, aside from the fact that concurring opinions have no binding precedential value, *see Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997), nothing in Justice Kavanaugh's concurrence undercuts the

Thus, in view of *Lorion* and *General Atomics*, it is clear we must read the Hobbs Act broadly to encompass not only all final NRC actions in licensing proceedings, but also all decisions that are preliminary, ancillary, or incidental to those licensing proceedings. *See Lorion*, 470 U.S. at 737, 743; *Gen. Atomics*, 75 F.3d at 539.[8]

## B. Public Watchdogs's Claim Challenged Decisions that Fall Within the  Scope of the Hobbs Act

Having determined the appropriate scope of the Hobbs Act, we must now determine whether Public Watchdogs's

---

reasoning of *General Atomics* such that the cases are "clearly irreconcilable," *Miller*, 335 F.3d at 900. In fact, Justice Kavanaugh's concurrence addressed a question wholly irrelevant to the case at hand—whether the Hobbs Act required a district court to accept the Federal Communication Commission's legal interpretation of the Telephone Consumer Protection Act in a subsequent private enforcement action. *See PDR Network, LLC*, 139 S. Ct. at 2058 (Kavanaugh, J., concurring).

[8] Our sister circuits have reached similar conclusions. *See, e.g.*, *Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 346–47 (1st Cir. 2004) (recognizing that *Lorion* requires courts to interpret the Hobbs Act "broadly" to "maximize the availability of initial circuit court review of licensing proceedings" and holding that "original jurisdiction in the courts of appeals is proper to review any NRC action that could be cognizable in a petition for review from a proceeding under [§] 2239"); *N.J., Dep't of Envtl. Prot. & Energy v. Long Island Power Auth.*, 30 F.3d 403, 410 (3d Cir. 1994) (recognizing the Hobbs Act is to be "liberally construed to allow exclusive jurisdiction in the court of appeals" (quoting *Conoco, Inc. v. Skinner*, 970 F.2d 1206, 1214 (3d Cir. 1992))); *Commonwealth Edison Co. v. U.S. Nuclear Regulatory Comm'n*, 830 F.2d 610, 612 (7th Cir. 1987) (recognizing that "issues preliminary or ancillary to the core issue" in a licensing proceeding should be reviewed in the same forum as the final order resolving the core licensing issue).

causes of action against the NRC and the Private Defendants challenge final NRC actions in licensing proceedings or challenge decisions preliminary, ancillary, or incidental thereto.

### i. Public Watchdogs's Claim Against the NRC Challenges NRC Licensing Decisions or Decisions Ancillary or Incidental to Licensing Decisions

Public Watchdogs asserted a single cause of action against the NRC for the violation of the APA, 5 U.S.C. § 702 *et seq.* The district court held it lacked subject-matter jurisdiction over this claim, because the claim directly challenged the grant of the 2015 License Amendments and the Certificate of Compliance for the Holtec System and the complained-of "Other Agency Actions"[9] raised issues preliminary or ancillary to those orders. Public Watchdogs first argues the district court "misconstrued" its APA claim as a challenge to the 2015 License Amendments, because "any fair reading" of the FAC reveals that the APA claim challenged the NRC's failure to halt Holtec and the Utility Defendants allegedly dangerous transfer of SNF. We disagree.

On its face, Public Watchdogs's FAC challenges the grant of the 2015 License Amendments and the Certificate of Compliance for the Holtec System—both final orders of the NRC for the purposes of the Hobbs Act. *See* 10 C.F.R.

---

[9] In the FAC, Public Watchdogs alleged that a category of other "final action[s]" of the NRC violated the APA and vaguely defined these "Other Agency Actions" to include "accepting amendments to certificates of compliance and granting exemptions from other statutory and regulatory requirements."

§ 72.210 (granting "[a] general license . . . for the storage of spent fuel in an independent spent fuel storage installation at power reactor sites to persons authorized to possess or operate nuclear power reactors"); *id.* § 72.212(a)(2) (limiting the general license in § 72.210 "to storage of spent fuel in [approved] casks"); *id.* § 72.214 (listing casks "approved for storage of spent fuel," including the Holtec System at issue in this case). For example, Public Watchdogs alleges in its FAC that "[t]he NRC's grant of the [Utility] Defendants' application for a License Amendment [in July 2015] was in violation of the [APA]." Public Watchdogs further alleges that the NRC issued the 2015 License Amendments without complying with the adjudicative rule-making requirements of 5 U.S.C. §§ 554, 556, 557, and the NRC's grant of the 2015 License Amendments was arbitrary, capricious, and an abuse of discretion. Ultimately, Public Watchdogs seeks to enjoin "the NRC from allowing the [Utility] Defendants to proceed with the decommissioning as provided for *in the License Amendment*." Public Watchdogs's FAC also challenges the Certificate of Compliance for the Holtec System, alleging that, *inter alia*, the Holtec SNF canisters "deviate[ ] from the acceptable minimum safety thresholds required for the design and manufacture of waste storage containers," and the NRC has accepted amendments to the Certificate of Compliance for the Holtec System without satisfying the above-referenced adjudicative rule-making requirements. Thus, the district court correctly determined that Public Watchdogs's APA claim directly challenged the grant of the 2015 License Amendments and the Certificate of Compliance for the Holtec System.

Accordingly, because the 2015 License Amendments and the Certificate of Compliance for the Holtec System are final orders of the NRC and relate to the grant or amendment of a

license or the "issuance or modification of rules and regulations dealing with the activities of licensees," 42 U.S.C. § 2239(a)(1)(A), "[t]he court of appeals . . . ha[d] exclusive jurisdiction to enjoin, set aside, suspend . . . , or to determine the validity of" those orders, 28 U.S.C. § 2342(4). Therefore, the district court correctly found that it lacked subject-matter jurisdiction over Public Watchdogs's APA claim against the NRC to the extent it challenged the 2015 License Amendments and the Certificate of Compliance for the Holtec System. *See Gen. Atomics*, 75 F.3d at 539; *see also N.J., Dep't of Envtl. Prot. & Energy*, 30 F.3d at 410, 412–13 (affirming the district court's dismissal of a plaintiff's National Environmental Policy Act claim against the NRC for lack of subject-matter jurisdiction under the Hobbs Act where the claim challenged a license amendment and a Certificate of Compliance for radioactive material canisters and therefore could not "be maintained in the district court").

Next, Public Watchdogs argues that the district court had subject-matter jurisdiction over its APA claim, because the following five "Other Agency Actions" fall outside of the scope of the Hobbs Act: (1) the NRC's exemption of Holtec from the requirement it receive pre-approval of its design change to the Holtec SNF canisters; (2) the NRC's decision to relieve Holtec from the responsibility of complying with the Certificate of Compliance for the Holtec SNF canisters; (3) the NRC's exemption of the Utility Defendants from the requirement they file an event report after the mishandling incident in July 2018; (4) the NRC's decision permitting Holtec to continue moving SNF from wet to dry storage in 2019; and (5) the NRC's decision permitting the Utility Defendants to resume transferring SNF from wet to dry storage, despite the two safety violations that occurred in 2018.

Public Watchdogs implies that three of the five complained-of NRC actions fall outside the scope of the Hobbs Act, because the actions relate to the issuance of an "exemption"—a type of NRC action that the Second Circuit in *Brodsky v. U.S. Nuclear Regulatory Commission*, 578 F.3d 175, 182 (2d Cir. 2009) held escapes the reach of the Hobbs Act. We need not decide whether *Brodsky* was correctly decided, however, because none of the identified actions involve the actual grant of an exemption by the NRC.

An "exemption" is a formal NRC action that relieves an NRC licensee of the duty to comply with a certain regulatory requirement. *See id.* at 177–78 (explaining "NRC regulations also permit the agency to grant 'exemptions from the requirements of regulations,' as long as" certain requirements are met (quoting 10 C.F.R. § 50.12(a)). Exemptions are granted by the NRC pursuant to specific regulations if certain requirements contained therein are met. For example, the regulations addressing licensing requirements for the independent storage of spent nuclear fuel allow the NRC to "grant such exemptions from the requirements of the regulations" if it determines the exemption is "authorized by law and will not endanger life or property or the common defense and security and are otherwise in the public interest." 10 C.F.R. § 72.7; *see also id.* § 50.12 (authorizing the NRC to grant exemptions to regulations related to the licensing of production and utilization facilities).

Here, none of the NRC actions identified by Public Watchdogs involve the grant of an "exemption" under an NRC regulation. For instance, although Public Watchdogs argues the NRC "exempted" Holtec from the requirement that it obtain pre-approval from the NRC for its purported design change to the Holtec SNF canisters, the identified allegations

do not detail the NRC's grant of an exemption to Holtec. Instead, the allegations complain of the NRC's reluctance "to censure the [Utility] Defendants for their repeated disregard of NRC regulations" and the NRC's decision not to impose a fine for the alleged violation.

Similarly, despite arguing that the NRC exempted Holtec from complying with the Certificate of Compliance for the Holtec System, Public Watchdogs fails to identify any "exemption" granted by the NRC that excused Holtec from complying with the Certificate of Compliance. Public Watchdogs's complaint at best contains a generic and conclusory allegation that the NRC has periodically "accept[ed] amendments to certificates of compliance and grant[ed] exemptions from other statutory and regulatory requirements." Even this allegation does not take issue with an alleged exemption related to a Certificate of Compliance, but instead challenges the NRC's alleged grant of exemptions from "*other* statutory and regulatory requirements." In response, Public Watchdogs points to allegations that, after learning the Holtec SNF canisters had been scratched, gouged, or dented, the NRC failed to "independently evaluate[ ] the increased risks posed by this damage to the canisters." But, again, these allegations do not describe the NRC's grant of an exemption.

Public Watchdogs finally implies that the NRC "exempted" the Utility Defendants from the requirement that they file an "Event Notification Report" after the Utility Defendants mishandled a fully-loaded Holtec SNF canister in July of 2018. Again, however, these allegations do not describe the NRC's grant of an exemption relieving the Utility Defendants of the requirement to file an "Event Notification Report." Instead, Public Watchdogs appears to

object either to the NRC's decision not to take enforcement action against the Utility Defendants for their failure to file the appropriate reports after the mishandling incidents in July and August of 2018 or the sufficiency of the penalty imposed for such violations.[10]

In sum, none of the complained-of "Other Agency Actions" involve the issuance of an exemption by the NRC, but instead focus on either the NRC's decisions not to take enforcement action against Holtec and the Utility Defendants or the sufficiency of the NRC's selected enforcement action. Thus, *Brodsky* is not implicated here.

Public Watchdogs also argues the five "Other Agency Actions" fall outside of the scope of the Hobbs Act, because they are not actions for the "granting, suspending, revoking, or amending of any license" and were taken after the grant of the 2015 License Amendments and after the issuance of the Certificate of Compliance for the Holtec System. This argument is not persuasive, because the Hobbs Act not only encompasses all final NRC actions in licensing proceedings but also all issues that are preliminary, ancillary, or incidental to those licensing proceedings. *See Lorion*, 470 U.S. at 737, 743; *Gen. Atomics*, 75 F.3d at 539. As discussed above, Public Watchdogs's APA claim is properly viewed as a challenge to the grant of the 2015 License Amendments and the Certificate of Compliance for the Holtec System over

---

[10] The final two NRC "actions" Public Watchdogs contends fall outside the scope of the Hobbs Act also do not involve the grant of an exemption. Rather, these "actions" relate to the NRC's alleged decisions to permit Holtec and the Utility Defendants to continue the movement of SNF from wet to dry storage, despite safety violations or potential safety violations at SONGS.

which the court of appeals had exclusive jurisdiction. Those final orders permitted the Utility Defendants to remove SNF from wet storage at SONGS and transfer it into the Holtec System as part of the decommissioning process. Public Watchdogs's challenge to the "Other Agency Actions" addresses the propriety of the NRC's subsequent decisions that permitted Holtec and the Utility Defendants to continue the transfer of SNF to the Holtec System at SONGS under the authority of the 2015 License Amendments and the Certificate of Compliance for the Holtec System. Thus, because the "Other Agency Actions" raise issues related to NRC actions that permitted Holtec and the Utility Defendants to *continue* transferring SNF to the Holtec System *under the authority of the 2015 License Amendments and Certificate of Compliance*, we agree with the district court that Public Watchdogs's challenge to the "Other Agency Actions" presents issues incidental or ancillary to its challenge to the grant of 2015 License Amendments and the Certificate of Compliance for the Holtec System. *Cf. Commonwealth Edison Co.*, 830 F.2d at 612–13 (finding, in an action where the "core issue" presented was "whether to grant operating licenses in a section 2239(a) proceeding," the court of appeal had jurisdiction over "[t]he 'ancillary or preliminary' issue [of] whether to uphold the NRC's bill for review costs incurred during the section 2239(a) proceeding considering [the licensee's] license application").

    **ii.  Even if Public Watchdogs's APA Claim Did Not Challenge the 2015 License Amendments or the Certificate of Compliance for the Holtec System, the Claim Still Falls Within the Scope of the Hobbs Act, Because It Seeks Relief that Should Have First Been (and Later Was) Pursued Before the NRC in a § 2.206 Petition**

Further, even assuming Public Watchdogs's APA claim did not challenge the grant of the 2015 License Amendments or the Certificate of Compliance for the Holtec System, Public Watchdogs's APA claim related to the "Other Agency Actions" still falls within the scope of the Hobbs Act, because it challenges NRC enforcement "decisions *not* to suspend" a license or licensed operations and seeks relief that should have first been pursued before the NRC in a § 2.206 petition. *See Lorion*, 470 U.S. at 738.

In *Lorion*, the Supreme Court held that § 2239 "vests in the courts of appeals initial subject-matter jurisdiction over [NRC] orders denying § 2.206 citizen petitions." *Id.* at 746. A citizen petition under § 2.206 "is but the first step in a process that will, if not terminated for any reason, culminate in a full formal proceeding under 42 U.S.C. § 2239(a)(1)." *Id.* at 745 n.11. This mechanism allows "[a]ny person" to file a request with the NRC to "institute a proceeding pursuant to [10 C.F.R.] § 2.202 to modify, suspend, or revoke a license, or for any other action as may be proper." 10 C.F.R. § 2.206(a). Therein, a petitioner can allege "a license violation or 'potentially hazardous conditions or other facts deemed to be sufficient ground for the proposed action.'" *N.J., Dep't of Envtl. Prot. & Energy*, 30 F.3d at 413 (quoting 10 C.F.R. § 2.202(a)(1)). The *Lorion* Court—recognizing that Congress defined the scope of review for § 2239 "solely by reference to the subject matter of the [NRC] action and not by reference to the procedural particulars of the [NRC] action"—determined that the courts of appeals had initial subject-matter jurisdiction over the denial of a § 2.206 petition, because Congress intended "to provide for initial court of appeals review of *all* final orders in licensing proceedings," including "[NRC] decisions *not* to suspend,

revoke, or amend" a license. 470 U.S. at 738–39, 746 (first emphasis added).

The five "Other Agency Actions" identified by Public Watchdogs all focus on either the NRC's decisions not to take enforcement action based on the alleged misconduct related to the 2015 License Amendments and Certificate of Compliance for the Holtec System or the NRC's failure to take (in Public Watchdogs's opinion) the appropriate enforcement action related to those orders. In briefing, Public Watchdogs makes plain the appropriate enforcement action that it believes the NRC failed to take was the suspension of the Private Defendants' decommissioning activities carried out under the 2015 License Amendments and the Certificate of Compliance for the Holtec System. Indeed, Public Watchdogs states that "any fair reading" of its APA claim shows it was a challenge to the NRC's failure to "halt" the Private Defendants' decommissioning activities. In that sense, like the denial of a § 2.206 petition, Public Watchdogs's APA claim challenged "[NRC] decisions *not* to suspend" the 2015 License Amendments or licensed operations over which the court or appeals had exclusive jurisdiction. *See id.* at 738, 746. Ultimately, to remedy these alleged failures, Public Watchdogs asked the district court to do, in effect, what the NRC declined to do with its enforcement actions—suspend the Private Defendants' licensed and certified operations at SONGS conducted under the authority of the 2015 License Amendments and the Certificate of Compliance for the Holtec System. In other words, Public Watchdogs's FAC sought relief identical to that which could have been requested in a § 2.206 petition.

Indeed, if Public Watchdogs wanted the NRC to take additional enforcement action related to the alleged

decommissioning misconduct at SONGS or to suspend the Private Defendants' decommissioning activities under the 2015 License Amendments, the proper course under NRC regulations was to first file a citizen petition pursuant to 10 C.F.R. § 2.206. *See Cnty. of Rockland*, 709 F.2d at 773–74 (recognizing a county's petition for review of an NRC order declining to shut down or take additional enforcement action at a nuclear plant must be dismissed, because the county failed to exhaust its administrative remedies by failing to, *inter alia*, file a § 2.206 petition). If the agency denied the petition, then Public Watchdogs could have appealed directly to this court. *See Lorion*, 470 U.S. at 746.

In fact, *after* Public Watchdogs filed its FAC, it chose to follow the path outlined above by submitting a § 2.206 petition to the NRC that addressed the *same* conduct and sought the *same* remedy from the NRC that it sought before the district court—a temporary suspension of decommissioning activities at SONGS. The NRC declined to take the requested action, and Public Watchdogs filed a petition for review of the denial of the § 2.206 petition *directly* with us.

Public Watchdogs's decision to file a § 2.206 petition that addressed the *same* conduct and sought the *same* remedy that it sought before the district court *and* its decision to appeal that action *directly* to us reinforces our conclusion that the district court did not have subject-matter jurisdiction over Public Watchdogs's APA claim. Public Watchdogs's APA claim challenged NRC "decisions *not* to suspend" a license or licensed conduct based on alleged decommissioning misconduct that also formed the basis of its § 2.206 petition. *See id.* at 738. If Public Watchdogs could divert review of this type of challenge to the district court from the court of

appeals simply by choosing not to file (or belatedly filing) a § 2.206 petition, we would be endorsing a "seemingly irrational bifurcated system" where the court of review would be predicated on the "procedural particulars of the [NRC] action" rather than the "subject matter of the [NRC] action." *See id.* at 739, 741–42. Moreover, this "seemingly irrational bifurcated system" would result in some NRC decisions related to licensing receiving two layers of judicial review while others received one. *See id.* at 742. "One crucial purpose of the Hobbs Act and other jurisdictional provisions that place initial review in the courts of appeals is to avoid the waste attendant upon this duplication of effort." *Id.* at 744. Like *Lorion*, we decline to endorse such an irrational approach that is at odds with this "crucial purpose of the Hobbs Act." *See id.* at 741–42, 744–45.

Finally, basic principles of administrative law also support our decision to allow the NRC to first address Public Watchdogs's § 2.206 petition that raises concerns related to the safety of NRC licensees' nuclear decommissioning activities—an area that is unquestionably within the NRC's special competence. *See Parisi v. Davidson*, 405 U.S. 34, 37 (1972) ("The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies."); *McKart v. United States*, 395 U.S. 185, 194 (1969) ("[I]t is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise.").

For the foregoing reasons, we hold the district court correctly determined it lacked subject-matter jurisdiction under the Hobbs Act, because Public Watchdogs's APA claim challenged final orders of the NRC related to licensing or challenged decisions incidental or ancillary thereto.[11]

### iii. Public Watchdogs's Claims Against Holtec and the Utility Defendants Challenge NRC Licensing Decisions or Decisions Ancillary or Incidental Thereto, and Challenge Conduct That Also Forms the Basis of Its § 2.206 Petition to the NRC

We must also determine whether Public Watchdogs's claims against the Private Defendants[12] fall within the scope of the Hobbs Act. To do this, we must once again ascertain whether Public Watchdogs's claims challenge final NRC orders in licensing proceedings or challenge decisions that are preliminary, ancillary, or incidental to those licensing proceedings. *See Lorion*, 470 U.S. at 737, 743; *Gen. Atomics*, 75 F.3d at 539.

Public Watchdogs asserted three causes of action against the Private Defendants: (1) a public liability action under the Price–Anderson Act; (2) a public nuisance claim under

---

[11] Because we conclude Public Watchdogs's challenge to the "Other Agency Actions" falls within the scope of the Hobbs Act, we do not reach the district court's alternative holding that it lacked jurisdiction to review those actions under 5 U.S.C. § 701(a)(2), because those actions constituted "presumptively unreviewable" enforcement decisions. *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (recognizing that an "agency's decision not to take enforcement action" is "presumptively unreviewable").

[12] We previously defined "Private Defendants" to include the Utility Defendants and Holtec.

California law; and (3) a strict product liability claim under California law. The district court held that all three causes of action fell within the Hobbs Act's scope, because they "trace back to actions that were taken pursuant to or that were incidental to the NRC's issuance of the July 2015 License Amendment or the [C]ertificate of [C]ompliance for the Holtec canisters." However, Public Watchdogs argues the district court's holding cannot be squared with the narrow scope of the Hobbs Act that only grants the court of appeals "exclusive jurisdiction" over actions *against the NRC* challenging its orders "granting, suspending, revoking, or amending" a license. *See* 28 U.S.C. 2342(4); 42 U.S.C. § 2239(a)(1)(A).

In the FAC, Public Watchdogs alleges the NRC improperly granted the Utility Defendants' request for a license amendment that permitted them to decommission SONGS. Public Watchdogs further alleges that the NRC selected Holtec as the supplier of the SNF containment system with reckless disregard for the safety and competence issues surrounding Holtec. Public Watchdogs's FAC also takes aim at the Holtec SNF canisters, alleging: (1) they do not comply with acceptable minimum safety requirements for the design and manufacture of SNF storage containers; and (2) they are defective as a result of a design change made by Holtec without the NRC's approval. Additionally, Public Watchdogs complains of the Utility Defendants' allegedly negligent decommissioning conduct, including using less personnel than necessary to ensure that Holtec SNF canisters are safely loaded into the SONGS ISFSI, scratching or gouging several Holtec SNF canisters prior to burying them at SONGS, and mishandling two loaded Holtec SNF canisters as they were loaded into the SONGS ISFSI.

Based on these allegations, Public Watchdogs claims the Private Defendants violated the Price–Anderson Act by "burying SNF in defective canisters that are destined to fail." Public Watchdogs's public nuisance claim, in turn, is predicated on the Private Defendants' reckless handling of the SNF, their failure to investigate and replace the defective Holtec SNF canisters, and their intent to continue to store additional SNF in the Holtec SNF canisters despite the known defects of the canisters. Finally, Public Watchdogs's strict products liability claim against Holtec is predicated on the allegedly defective design of the Holtec SNF canisters. To remedy these alleged violations, Public Watchdogs sought to enjoin any further decommissioning efforts by the Private Defendants.

Although Public Watchdogs frames its claims against the Private Defendants as a challenge to private entities' alleged mishandling of nuclear waste, it alleges the 2015 License Amendments (which permits the storage of SNF at SONGS in the storage systems certified by the NRC) were improperly granted and the Holtec SNF canisters (which were certified for the storage of SNF at SONGS by the NRC in a Certificate of Compliance) do not comply with minimum safety requirements for SNF storage containers and are defective. Thus, it is clear from the allegations in the FAC that Public Watchdogs's claims against the Private Defendants are properly viewed, in part, as a veiled challenge to the 2015 License Amendments and the Certificate of Compliance for the Holtec System.

We have previously rejected litigants' attempts to disguise their claims to avoid an exclusive avenue of judicial review selected by Congress. For example, in *American Bird Conservancy v. FCC*, 545 F.3d 1190, 1195 (9th Cir. 2008),

we held that a plaintiff could not avoid the Communications Act's and the Hobbs Act's exclusive avenue of judicial review in the courts of appeals by "characterizing its suit as a challenge to the agency's compliance with federal environmental laws rather than to the agency's ultimate order." There, to avoid Hobbs Act review in the court of appeals, the plaintiff attempted to use the Endangered Species Act's citizen-suit provision—which grants district courts subject-matter jurisdiction over suits by a person to enjoin any person that is violating the Endangered Species Act—to challenge the Federal Communication Commission's ("FCC") grant of registration applications for seven communication towers. *Id.* at 1191–92. The plaintiff "carefully disclaim[ed] any intent to challenge the tower registrations themselves" and instead framed its challenge "as an objection solely to the FCC's *failure to consult* with the Secretary [of the Interior] before granting the tower registrations." *Id.* at 1193. We rejected this attempt, however, and agreed with the FCC that, "despite [the plaintiff]'s artful pleading, [the plaintiff's] core objections [were] to the tower registrations themselves and to the FCC's policy of delegating to applicants its responsibilities under the [Endangered Species Act]." *Id.* Therefore, recognizing that, "[i]n analogous contexts, we ha[d] concluded that a plaintiff may not escape an exclusive avenue of judicial review through artful pleading," *id.* at 1194, we declined to let the plaintiff "avoid the strict jurisdictional limits imposed by Congress," *id.* at 1195 (quoting *Cal. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911 (9th Cir. 1989)).

In reaching this decision, we relied on our earlier decision in *California Save Our Streams Council, Inc.*, where the Federal Energy Regulatory Commission ("FERC") granted Alternative Energy Resources a license to construct and

operate a hydroelectric power facility in the Sierra National Forest. 887 F.2d at 909. The Federal Power Act required FERC to solicit and accept conditions for the license determined by the Forest Service (the agency responsible for the protection and use of the Sierra National Forest). *Id.* at 910. The plaintiffs proceeded to challenge the FERC license conditions in administrative proceedings held before the Forest Service and in district court. *Id.* In the district court, the plaintiffs argued FERC's grant of the license violated the National Environmental Policy Act ("NEPA") and the American Indian Religious Freedom Act ("AIRFA"); thus, it argued the district court had subject-matter jurisdiction over the dispute under 28 U.S.C. §§ 1331, 1343, and 1362. *Id.* The district court disagreed, finding the language of the Federal Power Act vested exclusive jurisdiction over the plaintiffs' action in the courts of appeals. *See id.*

On appeal, we held that the Federal Power Act "vest[ed] sole jurisdiction over questions arising under the FERC licenses in the [c]ourts of [a]ppeals." *Id.* at 911. Undeterred, the plaintiffs argued that the Federal Power Act's exclusive judicial review provisions were simply not applicable, because: (1) "their suit was filed against the Forest Service and arose under the provisions of NEPA and AIRFA"; and (2) "they [were] not attacking the licensing decision made by FERC but instead [were] seeking review only of the Forest Service's failure to follow the procedural and substantive steps outlined in statutes outside the purview of power and energy regulation." *Id.* We rejected this argument, reasoning that,

> although [the plaintiffs] seek to characterize
> the proceedings as an attack on the Forest

> Service's actions, it is clear that the suit is an attempt to restrain the licensing procedures authorized by FERC. The . . . conditions imposed by the [Forest] Service have no significance outside the licensing process, and we do not believe that the jurisdictional remedy prescribed by Congress hangs on the ingenuity of the complaint. . . . Thus, even if they attempt to style [their complaint] as an independent claim against the Forest Service, the practical effect of the action in district court is an assault on an important ingredient of the FERC license.

*Id.* at 912. Ultimately, we agreed with the district court that it lacked subject-matter jurisdiction over the dispute. *Id.*

Despite Public Watchdogs's artful pleading, it is clear its claims against the Private Defendants are an attempt to challenge the 2015 License Amendments, the Certificate of Compliance for the Holtec System, and actions taken by the licensees under the authority of both of those final NRC orders. *See id.*; *Am. Bird Conservancy*, 545 F.3d at 1193–95. Thus, like the plaintiffs in *American Bird Conservancy* and *California Save Our Streams Council, Inc.*, Public Watchdogs cannot avoid the Hobbs Act's exclusive avenue of judicial review by artfully pleading its challenge to the 2015 License Amendments and the Certificate of Compliance for the Holtec System as a Price–Anderson, public nuisance, or strict products liability claim.

Moreover, to the extent Public Watchdogs's claims against the Private Defendants also challenge the Private Defendants' conduct that is expressly licensed, certified, and

regulated by the NRC, any such challenge falls within the scope of the Hobbs Act. Put differently, the 2015 License Amendments and the Certificate of Compliance are "inextricably intertwined" with the NRC's regulatory and enforcement decisions that are in turn related to the challenged conduct of the Private Defendants. *See Am. Bird Conservancy*, 545 F.3d at 1193. Thus, reading § 2239 "liberally" and the Hobbs Act "broadly" to encompass not only all final NRC actions in licensing proceedings, but all issues that are preliminary, ancillary, or incidental to those licensing proceedings, we agree with the district court that Public Watchdogs's claims against the Private Defendants fall within the scope of the Hobbs Act. *See Gen. Atomics*, 75 F.3d at 539.

Our conclusion that Public Watchdogs's claims against the Private Defendants fall within the scope of the Hobbs Act is, again, bolstered by Public Watchdogs's decisions to file a § 2.206 petition that addressed the *same* conduct of the Private Defendants and sought the *same* remedy as the district court action *and* its decision to appeal that order *directly* to us. *See Lorion*, 470 U.S. at 746 (holding that § 2239 places initial subject-matter jurisdiction over NRC orders denying § 2.206 petitions in the courts of appeals).

Therefore, we hold that the district court correctly found it lacked jurisdiction over Public Watchdogs's claims against the Private Defendants, because they challenged NRC licensing orders or NRC decisions that were ancillary or incidental to NRC licensing decisions.

## IV. CONCLUSION

Because Public Watchdogs's FAC challenged NRC licensing orders or NRC decisions that were ancillary or incidental to NRC licensing decisions, the district court correctly determined that it did not have subject-matter jurisdiction under the Hobbs Act.[13] Accordingly, the district court's dismissal of Public Watchdogs's FAC with prejudice is **AFFIRMED.**

---

[13] Because we conclude that the district court correctly determined it lacked subject-matter jurisdiction over Public Watchdogs's complaint, we do not reach the district court's alternative holding that Public Watchdogs failed to allege facts sufficient to state a claim for relief under the Price–Anderson Act, California public nuisance law, or California strict products liability law.