**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SAN LUIS OBISPO MOTHERS FOR PEACE; FRIENDS OF THE EARTH; ENVIRONMENTAL WORKING GROUP, <br><br> *Petitioners*, <br><br> v. <br><br> UNITED STATES NUCLEAR REGULATORY COMMISSION; UNITED STATES OF AMERICA, <br><br> *Respondents*, <br><br> -------------------------------------- <br><br> PACIFIC GAS & ELECTRIC COMPANY, <br><br> *Intervenor*. | No. 23-852 <br><br> NRC-2023-0043 Nuclear Regulatory Commission <br><br> OPINION |

On Petition for Review of an Order of the
Nuclear Regulatory Commission

Argued and Submitted January 10, 2024
Pasadena, California

Filed April 29, 2024

Before: Consuelo M. Callahan and Mark J. Bennett, Circuit Judges, and Gary S. Katzmann, Judge.[*]

Opinion by Judge Callahan

## SUMMARY[**]

### Nuclear Regulatory Commission

The panel denied a petition for review of the U.S. Nuclear Regulatory Commission ("NRC")'s decision granting Pacific Gas & Electric ("PG&E")'s request for an exemption to the deadline for a federal license renewal application for the continued operation of the Diablo Canyon Nuclear Power Plant.

In 2022, the California Legislature directed PG&E to pursue any actions needed to extend operations at Diablo Canyon. Prior to that point, PG&E had been working to cease operations at Diablo Canyon's two nuclear power units, and the deadline to qualify for continued operation during the NRC's review of a license renewal application had passed. In granting PG&E's requested exemption to the renewal deadline, the NRC found that the exemption was authorized by law, there would be no undue risk to public

---

[*] The Honorable Gary S. Katzmann, Judge for the United States Court of International Trade, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

health and safety, and special circumstances were present. The NRC also concluded that the exemption met the eligibility criteria for a categorical exclusion, and no additional environmental review under the National Environmental Policy Act ("NEPA") was required.

The panel first addressed whether the Hobbs Act granted the court jurisdiction to hear a direct appeal from an NRC exemption decision. Applying a case-by-case approach, the panel held that where, as here, the substance of the exemption is ancillary or incidental to a licensing proceeding, there is jurisdiction.

The panel further concluded that petitioners, three non-profit organizations concerned with the dangers posed by nuclear power, had Article III standing to bring this case. Petitioners alleged a non-speculative potential harm from age-related safety and environmental risks; demonstrated that under the Exemption Decision, Diablo Canyon will in all likelihood continue operations beyond its initial 40-year license term; and alleged members' proximity to the facility.

The panel held that NRC's decision to grant the exemption was not arbitrary, capricious, or contrary to law. Nor did the NRC act arbitrarily or capriciously in invoking the NEPA categorical exclusion when issuing the Exemption Decision. The NRC was not required to provide a hearing or meet other procedural requirements before issuing the Exemption Decision because the Exemption was not a licensing proceeding. NRC adequately explained why California's changing energy needs constituted a special circumstance, and why the record supported its findings of no undue risk to the public health and safety.

## COUNSEL

Diane Curran, I (argued), Harmon Curran Spielberg & Eisenberg LLP, Washington, D.C., for Petitioner San Luis Obispo Mothers for Peace.

Eric V. Michel (argued), Senior Attorney; Andrew P. Averbach, Solicitor; Marian L. Zobler, General Counsel; U.S. Nuclear Regulatory Commission, Office of the General Counsel, Rockville, Maryland; Justin D. Heminger, Senior Litigation Counsel; Todd Kim, Assistant Attorney General; Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C.; for Respondent.

Michael E. Kenneally (argued), Ryan K. Lighty, and Paul M. Bessette, Morgan Lewis & Bockius LLP, Washington, D.C., for Intervenor Pacific Gas & Electric Company.

Richard E. Ayres, Ayres Law Group, Washington, D.C., for Petitioner Friends of the Earth.

Caroline Leary, Environmental Working Group, Washington, D.C., for Petitioner Environmental Working Group.

Megan K. Hey, Deputy Attorney General; Laura J. Zuckerman, Supervising Deputy Attorney General; Edward H. Ochoa, Senior Assistant Attorney General; Rob Bonta, California Attorney General; California Attorney General's Office, Los Angeles, California; for Amicus Curiae State of California.

# OPINION

CALLAHAN, Circuit Judge:

In 2022, the State of California determined that it faces significant uncertainty in the stability and reliability of its electricity grid as it transitions to renewable energy generation. To hedge against possible insufficient energy supply in the face of climate-related incidents impacting energy production such as drought, wildfire, and heat waves, the California Legislature directed Pacific Gas & Electric Co. ("PG&E") to pursue any actions needed to extend operations at the Diablo Canyon Nuclear Power Plant ("Diablo Canyon").

Prior to that point, PG&E, which holds the federal licenses to operate Diablo Canyon, had been working to cease operations at Diablo Canyon's two nuclear power units. California's directive forced PG&E to change course and seek renewal of its operating license. At that point, the deadline to qualify for continued operation during the United States Nuclear Regulatory Commission ("NRC")'s review of a license renewal application had passed. PG&E asked for an exemption to this timely renewal deadline, and NRC granted PG&E's request.

Petitioners San Luis Obispo Mothers for Peace, Friends of the Earth, and the Environmental Working Group (collectively, "Petitioners"), three non-profit organizations concerned with the dangers posed by nuclear power,[1] object

---

[1] Mothers for Peace is "a non-profit membership organization concerned with the dangers posed by Diablo Canyon and other nuclear reactors, nuclear weapons, and radioactive waste" and it "has participated in NRC

to the NRC's decision and PG&E's continued operation of the power plant.  They petition the Ninth Circuit for review of NRC's grant of an exemption and NRC's issuance of a categorical exclusion under the National Environmental Policy Act ("NEPA"), arguing that under the Administrative Procedure Act ("APA"), NRC's decisions are not authorized by law and not supported by the record.

This case requires us to first address whether the Hobbs Act, 28 U.S.C. § 2324 grants this court jurisdiction to hear a direct appeal from an NRC exemption decision.  We determine that where, as here, the substance of the exemption is ancillary or incidental to a licensing proceeding, we have jurisdiction.  *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743 (1985); *General Atomics v. U.S. Nuclear Regul. Comm'n*, 75 F.3d 536, 539 (9th Cir. 1996).  Assured of our jurisdiction, we further conclude that Petitioners have Article III standing to bring this case, and that NRC's decision to grant the exemption was not arbitrary, capricious, or contrary to law.  We deny the petition.

---

licensing cases involving the Diablo Canyon reactors since 1973." Friends of the Earth is a "nonprofit environmental advocacy organization dedicated to improving the environment and creating a more healthy and just world."  Environmental Working Group is a "non-profit, non-partisan organization that works to empower people to live healthier lives in a healthier environment."  Like Mothers for Peace, it has a strong presence in California, has participated in utility commission proceedings in the state, and is highly concerned about safety and environmental hazards of Diablo Canyon.

## I.

## A.

Under the Atomic Energy Act of 1954, the Atomic Energy Commission was made responsible for licensing and regulating use of radioactive material, including the construction and operation of commercial nuclear power plants. 42 U.S.C. §§ 2201, 2131–33. In 1974, Congress passed the Energy Reorganization Act, creating the NRC and transferring to it "all the licensing and related regulatory functions of the Atomic Energy Commission" and tasking it with regulating use of radioactive materials to promote the common defense and security and public health and safety. 42 U.S.C. § 5841(f); *see also id.* §§ 5841(a)(1), 2201(b). The NRC has in turn promulgated extensive regulations governing the issuance of licenses to operate nuclear power plants. *See* 10 C.F.R. parts 50, 52.

The Atomic Energy Act specifies that the term of an original license must not exceed forty years. 42 U.S.C. § 2133(c). A license can, however, be renewed for a subsequent term not to exceed twenty years beyond the license's original expiration date. *Id.*; 10 C.F.R. § 54.31(b). Alternatively, an operator of a nuclear power plant may choose to terminate operations and enter a decommissioning process by which a facility is removed from service and nuclear materials are safely stored or disposed of. *See generally,* 10 C.F.R part 20, subpart E; 10 C.F.R. § 30.36. These different licensing-related "proceedings" typically require a public notice and hearing process, *see* 42 U.S.C. § 2239, and more generally, "any person whose interest may be affected by a proceeding and who desires to participate as a party" can file a written request for a hearing, 10 C.F.R.

§ 2.309(a); *see also id.* § 54.27 (hearing notice requirements for license renewals).

NRC regulations addressing license renewals include what is colloquially referred to as the "timely renewal rule." *See* 10 C.F.R. § 2.109. Under the APA, which applies to NRC actions taken pursuant to the Atomic Energy Act, *see* 42 U.S.C. § 2231, "[w]hen a licensee has made timely and sufficient application for a renewal . . . a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency." 5 U.S.C. § 558(c). This provision protects federal license holders (like PG&E) "from harm associated with delays in agency action on requests for license renewals." *Comm. for Open Media v. FCC*, 543 F.2d 861, 867 (D.C. Cir. 1976). NRC regulations implementing this provision of the APA require a licensee of a nuclear power plant to file an application for license renewal at least five years before the expiration of the existing license in order to qualify for timely renewal protection. 10 C.F.R. § 2.109(b)[2]; *see also* 10 C.F.R. § 54.17(a).

NRC regulations also authorize exemptions from certain regulatory requirements if NRC finds that (1) the exemption is authorized by law; (2) the exemption will not present an undue risk to the public health and safety; (3) the exemption

---

[2] The text of NRC's timely renewal rule states:

> "If the licensee of a nuclear power plant . . . files a sufficient application for renewal of either an operating license or a combined license at least 5 years before the expiration of the existing license, the existing license will not be deemed to have expired until the application has been finally determined."

10 C.F.R. § 2.109(b).

is consistent with the common defense and security; and (4) that special circumstances are present.   10 C.F.R. § 50.12(a).   NRC regulations identify six categories of special circumstances:

> (i) Application of the regulation in the particular circumstances conflicts with other rules or requirements of the Commission; or
> (ii) Application of the regulation in the particular circumstances would not serve the underlying purpose of the rule or is not necessary to achieve the underlying purpose of the rule; or
> (iii) Compliance would result in undue hardship or other costs that are significantly in excess of those contemplated when the regulation was adopted, or that are significantly in excess of those incurred by others similarly situated; or
> (iv) The exemption would result in benefit to the public health and safety that compensates for any decrease in safety that may result from the grant of the exemption; or
> (v) The exemption would provide only temporary relief from the applicable regulation and the licensee or applicant has made good faith efforts to comply with the regulation; or
> (vi) There is present any other material circumstance not considered when the

> regulation was adopted for which it would be
> in the public interest to grant an exemption.

*Id.* § 50.12(a)(2), *see id.* § 54.15 (applying exemptions to license renewals).  NRC has previously issued exemptions to the timely renewal rule, allowing licensees to file renewal applications less than five years in advance of license expiration dates and still qualify for timely renewal protection.  *See, e.g.*, Oyster Creek Nuclear Generating Station; Exemption, 69 Fed. Reg. 78054 (Dec. 22, 2004); Perry Nuclear Power Plant Unit No. 1; Exemption, 85 Fed. Reg. 43609 (July 17, 2020); Clinton Power Station Unit 1; Exemption, 84 Fed. Reg. 34410 (July 18, 2019).

**B.**

Diablo Canyon is located in coastal San Luis Obispo County and contains two units licensed by NRC—Unit 1 has been in operation since 1985 and Unit 2 has been in operation since 1986.  The current licenses (granted for the statutorily allowed maximum of forty years) will expire on November 2, 2024, and August 26, 2025, respectively.  Consistent with NRC's timely renewal rule, *see* 10 C.F.R. § 2.109(b), PG&E submitted a license renewal application for Units 1 and 2 in November 2009.  NRC docketed[3] the applications thereby commencing its review of the renewal application and conferring timely renewal status on PG&E.  However, PG&E changed course in 2018.  PG&E submitted an initial request to NRC to delay the decision on PG&E's pending renewal application, made a follow up request to suspend review of the application, and submitted a third

---

[3] Docketing is the formal acceptance by NRC of an application that is sufficiently complete.  *See* 10 C.F.R. § 2.101(a); *see also* § 2.303.  The public can access docketed materials at regulations.gov.

request on March 7, 2018, to withdraw the application.  NRC granted PG&E's request to withdraw, terminated review, and closed the docket.   At that point, PG&E began decommissioning efforts with the intent to suspend operation of Units 1 and 2 at the end of their current operating licenses.

In September 2022, California enacted Senate Bill No. 846 ("SB 846").  The bill invalidated the prior approval by the state utilities commission of PG&E's plans to retire Diablo Canyon and directed PG&E (in coordination with the relevant state agencies) to take actions necessary to extend operation of Diablo Canyon until the new target retirement dates specified in the legislation.   The Legislature declared that "seeking to extend the Diablo Canyon powerplant's operations for a renewed license term is prudent, cost effective, and in the best interests of all California electricity customers."  Cal. Pub. Res. Code § 25548(b).  It explained:

> [T]he purpose of the extension of the Diablo Canyon powerplant operations is to protect the state against significant uncertainty in future demand resulting from the state's greenhouse-gas-reduction efforts involving electrification of transportation and building energy end uses and regional climate-related weather phenomenon, and to address the risk that currently ordered procurement will be insufficient to meet this supply or that there may be delays in bringing the ordered resources online on schedule.

Cal. Pub. Util. Code § 712.8(q).  SB 846 directed state agencies and PG&E to "act quickly and in coordination to

take all actions necessary and prudent to extend Diablo Canyon powerplant operations." Cal. Pub. Res. Code § 25548(f). SB 846 was passed as an "urgency statute," effective immediately upon signing because it was "necessary for the immediate preservation of the public peace, health, or safety." S.B. 846 § 18, 2021-2022 Leg., Reg. Sess. (Cal. 2022).

In response, PG&E submitted a letter to NRC on October 31, 2022. The letter requested that NRC either resume review of PG&E's previously submitted and withdrawn renewal application or grant an exemption from the five-year timely renewal submission deadline in 10 C.F.R. § 2.109(b). In other words, PG&E requested an exemption that would allow it to operate Diablo Canyon's nuclear power units beyond November 2024 and August 2025 until NRC issues a final order on its license renewal application.

## C.

On January 24, 2023, NRC staff responded to PG&E, stating NRC would not resume review of the withdrawn application and that the agency was still evaluating the exemption request. On March 8, 2023, NRC granted PG&E the requested exemption (the "Exemption Decision"), determining that "pursuant to 10 C.F.R. [§] 54.15 and 10 C.F.R. [§] 50.12, the requested exemption is authorized by law, will not present an undue risk to the public health and safety, and is consistent with the common defense and security" and that "special circumstances as defined in 10 C.F.R. [§] 50.12(a)(2), are present." NRC conditioned the grant of PG&E's timely renewal status on PG&E's submission of a license renewal application by December 31, 2023, and on NRC's determination that the application

was sufficient for docketing.[4]  88 Fed. Reg. 14395 (Mar. 8, 2023).  NRC also issued a categorical exclusion under the NEPA.

In the Exemption Decision, NRC first found that the requested exemption was "authorized by law," noting that nothing in the Atomic Energy Act or the APA prohibited granting an exemption or required renewal applications be submitted in the five-year period specified in 10 CFR § 2.109(b).  Rather, the five-year period adopted in regulation was a discretionary choice by the agency designed to provide a reasonable amount of time to review a renewal application prior to expiration of the license.  Additionally, because the exemption requested by PG&E was, at base, a scheduling change and administrative in nature, and because NRC has authority to grant an exemption from regulatory requirements, NRC determined that granting PG&E's requested exemption was not in violation of any law or regulation.

NRC next addressed the requirement that there be no "undue risk to the public health and safety." 10 C.F.R. § 50.12(a)(1).  NRC noted the exemption would not change the manner in which Diablo Canyon operates or otherwise cause a change to the facility.  88 Fed. Reg. at 14397.  Furthermore, NRC would "continue to conduct all regulatory activities associated with licensing, inspection, and oversight" and "take whatever action may be necessary to ensure adequate protection of the public health and safety."  *Id.*  Additionally, NRC stated it would undertake a "focused, efficient review," building on work already done

---

[4] PG&E met this deadline, submitting its renewal application on November 7, 2023.  NRC docketed the application on December 19, 2023.

on PG&E's previously withdrawn application, to determine if any immediate safety measures were needed. *Id.* NRC also found that, because the exemption did not alter the design, function, or operation of Diablo Canyon in any way, the exemption was "consistent with the common defense and security." *Id.*

Next, NRC determined that "special circumstances were present," specifically that other material circumstances existed which were not considered when the regulation was adopted (*see* 10 C.F.R. § 50.12(a)(2)(vi)). NRC found that the adoption of SB 846 and California's policy directive to keep Diablo Canyon operating "based, in part, on climate change impacts and serious electricity reliability challenges" constituted "other material circumstances" under 10 C.F.R. § 2.109(b)(vi). 88 Fed. Reg. at 14398. Overall, NRC found the information PG&E provided was "compelling and demonstrate[d] that the special circumstances . . . are present and that it would be in the public interest to grant this exemption." *Id.*

Finally, NRC addressed environmental considerations under NEPA. NRC evaluated whether the Exemption Decision qualified for a categorical exclusion under NRC regulation, which outlines six factors to consider. *See* 10 C.F.R. § 51.22(c)(25). Specifically, NRC found (1) the Exemption Decision did not involve a significant hazard (i.e., a significant increase in the probability or consequences of an accident, a possibility of a new or different kind of accident, or a significant reduction in margin of safety); (2) there were no significant changes in the types or amount of any effluents released offsite; (3) there was no significant increase in public or occupational radiation exposure; (4) the exempted regulation did not deal with construction so there was no significant construction impact; (5) the exemption

was administrative in nature and did not impact the probability or consequences of accidents; and (6) the exemption involved scheduling requirements because it modified a filing deadline. 88 Fed. Reg. at 14398. NRC "conclude[d] that the proposed exemption meets the eligibility criteria for a categorical exclusion set forth in 10 C.F.R. [§] 55.22(c)(25)" and no additional environmental review under NEPA was required. *Id.*

Petitioners filed multiple letters with NRC opposing PG&E's requests. After NRC issued the Exemption Decision, Petitioners submitted a request for the NRC to reverse the decision. On April 28, 2023, Petitioners filed the petition for review currently before us, challenging both the Exemption Decision and the NEPA categorical exclusion. PG&E intervened, and the State of California filed an amicus brief.

## II.

We first consider our jurisdiction to hear this case on direct appeal from NRC. Judicial review of NRC decisions is governed by the Hobbs Act, 28 U.S.C. § 2342, which gives "[t]he court of appeals . . . exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of [the NRC] made reviewable by [42 U.S.C. § 2239]." Under 42 U.S.C. § 2239(a)(1)(A), the court of appeals has direct jurisdiction over a final order in "any proceeding . . . for the granting, suspending, revoking, or amending of any license." Challenges to NRC actions that do not fit within this grant of jurisdiction may still be brought in federal district court.

The parties dispute whether NRC's grant of an exemption to the timely renewal rule is a proceeding granting, suspending, revoking, or amending a license such

that it is directly appealable to the courts of appeals. All agree that a decision related to a license renewal or amendment are within Hobbs Act jurisdiction. Petitioners argue that the Hobbs Act must be read broadly to encompass any NRC decision that is preliminary or incidental to licensing, citing *General Atomics v. U.S. Nuclear Regulatory Commission*, 75 F.3d 536, 538–39 (9th Cir. 1996). According to Petitioners, the Exemption Decision fits into that category because, without the exemption, PG&E would be unable to continue operations beyond the expiration of Diablo Canyon's current licenses and it is therefore a decision that acts as an amendment to PG&E's license. NRC responds that issuance of an exemption is not a license proceeding and therefore this court lacks jurisdiction to hear the case.

## A.

The existing case law discussing Hobbs Act jurisdiction is instructive. The Supreme Court in *Florida Power & Light Co. v. Lorion* considered the reviewability of NRC's denial of a citizen petition under 10 C.F.R. § 2.206 requesting that the NRC institute a proceeding to modify, suspend, or revoke the license of a nuclear reactor. 470 U.S. 729, 731 (1985). The Court's primary concern was whether a hearing—rather than the mere denial thereof—was necessary to trigger the court of appeals' initial review jurisdiction under the Hobbs Act. *Id.* at 737. In holding that a formal hearing was not a prerequisite to Hobbs Act jurisdiction, the Court determined that "Congress decided on the scope of judicial review . . . solely by reference to the subject matter of the [NRC] action and not by reference to the procedural particulars of the [NRC] action." *Id.* at 739. The Court ultimately held that § 2239 vests initial subject-

matter jurisdiction in the federal courts of appeals over NRC orders denying § 2.206 petitions. *Id.* at 746.

In arriving at that conclusion, the *Lorion* Court explained the consequences of a different outcome. Cases outside of Hobbs Act jurisdiction would be within the jurisdiction of the federal district courts. If direct appellate review of NRC decisions depended on a hearing having occurred, different decisions related to the same license proceedings might be heard in either the court of appeals or the district courts—"a seemingly irrational bifurcated system" whereby some decisions received two layers of judicial review and some received only one. *Id.* at 742 (quoting *Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 197 (1980)). The Court further noted that the fact-finding function of a district court was typically unnecessary in judicial review of agency decisions, which are considered based on the record before the agency. *Id.* at 743–44. The Court observed that "[o]ne purpose of the Hobbs Act [was] to avoid the duplication of effort involved in creation of a separate record before the agency and before the district court." *Id.* at 740. Such duplication and associated delays "would defeat the very purpose of summary or informal procedures before the agency—saving time and effort in cases not worth detailed formal consideration or not requiring a hearing on the record." *Id.* at 742–43. Therefore, "[a]bsent a firm indication that Congress intended to locate initial APA review of agency action in the district courts, [the Court] will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." *Id.* at 745. In light of these considerations, the Court held that "review of orders resolving issues preliminary or ancillary to the core issue in a proceeding should be reviewed in the same forum as the final order resolving the core issue." *Id.* at 743.

This court has also considered the scope of Hobbs Act jurisdiction over NRC decisions. In *General Atomics*, we attributed to the *Lorion* Court the proposition that "the Hobbs Act is to be read broadly to encompass all final N[RC] decisions that are preliminary or incidental to licensing" and that § 2239 should be "read liberally." 75 F.3d at 539. Based on those principles, we concluded that a challenge to an NRC order holding a parent company jointly and severally liable for cleanup costs that were the responsibility of its subsidiary (the actual licensee) was within the scope of our jurisdiction under the Hobbs Act. *Id.* at 538–39. We explained that a determination of whether the parent company was in fact a licensee "would directly involve the granting and possible amending" of the plant's license. *Id.* at 539.

We confirmed this interpretation in *Public Watchdogs v. Southern California Edison Co.*, 984 F.3d 744 (9th Cir. 2020). There, we noted that "in view of *Lorion* and *General Atomics*, it is clear we must read the Hobbs Act broadly to encompass not only all final NRC actions in licensing proceedings, but also all decisions that are preliminary, ancillary, or incidental to those licensing proceedings." *Id.* at 757–58. In that case, a nuclear facility had begun the decommissioning process, and NRC had granted related license amendments and approved use of a certain system for storing spent nuclear rods. *Id.* at 751–52. Petitioners brought suit in federal district court seeking to enjoin the allegedly deficient decommissioning activities and storage system. *Id.* at 753–54. The district court dismissed for lack of jurisdiction, finding the NRC decision fell within the scope of the Hobbs Act and thus must be challenged before the Ninth Circuit. *Id.* at 755. We affirmed. Despite arguments that certain of the challenged decisions were

exemptions that fell outside the Hobbs Act, we held that the challenged actions were properly characterized as related and incidental to implementation of the license amendment and therefore within our Hobbs Act jurisdiction. *Id.* at 757–61.

Because we found the challenged actions in *Public Watchdogs* were not properly considered to be exemptions, we had no occasion to address the Second Circuit's decision in *Brodsky v. U.S. Nuclear Regulatory Commission*, 578 F.3d 175 (2d Cir. 2009). Here, NRC urges us to adopt the Second Circuit's approach. In *Brodsky*, petitioners challenged NRC's issuance to a nuclear power plant of an exemption from a fire safety regulation without providing a hearing. *Id.* at 177. The Second Circuit held that the Hobbs Act did not grant the circuit court initial review jurisdiction over exemptions, noting that "[t]he plain text of § 2239(a) does not confer appellate jurisdiction over final orders issued in proceedings involving exemptions." *Id.* at 180. The Second Circuit deferred to NRC's view that an exemption was distinct from "the granting, suspending, revoking, or amending" of a license under § 2239(a). *Id.* at 180–81. While recognizing policy advantages such as judicial efficiencies, the Second Circuit found those policy arguments insufficient to overcome what it viewed as the plain intent of Congress. *Id.* at 181. Reviewing the legislative history, the Second Circuit pointed out that Congress did not choose to include exemptions within the review provision despite the existence of the exemption regulations prior to Congress' amending § 2239(a). *Id.* Therefore, the *Brodsky* court held that it "lack[ed] jurisdiction under the Hobbs Act to review an NRC exemption." *Id.* at 182.

The Second Circuit then turned to consider whether the challenged order was in fact an exemption or more properly regarded as a license amendment. *Id.* at 182–83. The Second Circuit determined that NRC had reasonably applied its regulations when it classified the order as an exemption and not an amendment. *Id.* (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). Noting that NRC could likely have also treated the order as an amendment, and that "under the NRC regulations, little appears to distinguish an exemption from an amendment," the Second Circuit nonetheless held that it must defer to NRC's reasonable application of its own regulations. *Id.* at 183. Finding that it therefore lacked jurisdiction, the *Brodsky* court dismissed the petition. *Id.* at 184.

No other circuits have considered the question of Hobbs Act jurisdiction over exemptions in as much detail as the Second Circuit. However, many have reached the merits of exemption decisions without pausing for jurisdictional questions. *See Massachusetts v. U.S. Nuclear Regul. Comm'n*, 878 F.2d 1516 (1st Cir. 1989); *Kelley v. Selin*, 42 F.3d 1501 (6th Cir. 1995); *Commonwealth Edison Co. v. U.S. Nuclear Regul. Comm'n*, 830 F.2d 610 (7th Cir. 1987); *Shoreham-Wading River Cent. Sch. Dist. v. Nuclear Regul. Comm'n*, 931 F.2d 102 (D.C. Cir. 1991); *see also Honeywell Int'l, Inc. v. U.S. Nuclear Regul. Comm'n*, 628 F.3d 568, 575–76 (D.C. Cir. 2010) (finding the challenged exemptions were more properly considered license amendments, and therefore fell within the ambit of the Hobbs Act).

Consistent with these cases, we decline to announce a *per se* rule whereby exemptions categorically escape Hobbs

Act review.[5]  None of our precedent suggests such a bright line rule, and the NRC's classification of an action cannot be dispositive of our jurisdiction. [6]  Exemptions "relieve[] an NRC licensee of the duty to comply with certain regulatory requirements," and can vary as much as the regulations they exempt. *Public Watchdogs*, 984 F.3d at 760 (citing *Brodsky*, 578 F.3d at 182).    Many exemptions bear no direct relationship to another license-related proceeding. *See, e.g.*, *Brodsky*, 578 F.3d at 178 (exemption from enforcement of a fire safety regulation that would have otherwise forbidden use of a particular brand of fire barrier).  Other regulations, however, may relate directly to licensing proceedings.  For example, the § 2.206 petition at issue in *Lorion* resolved "issues preliminary or ancillary to the core issue in a [Hobbs Act-enumerated] proceeding." *Lorion*, 470 U.S. at 743.

We therefore hold, consistent with *Lorion*, *General Atomics*, and *Public Watchdog*, that NRC exemption decisions must be examined on a case-by-case basis to determine whether they fall within the broad and liberally interpreted grant of jurisdiction over proceedings that are

---

[5] *Brodsky* is not to the contrary.  The Second Circuit in *Brodsky* rejected the proposition that an exemption order *is* an order for "the granting, suspending, revoking, or amending of any license." *See* 578 F.3d at 180 (quoting *Lorion*, 470 U.S. at 743).  As discussed below, Hobbs Act jurisdiction exists here because the Exemption Decision resolves an issue that is ancillary or incidental to the "core issue" of a license proceeding.

[6] All courts agree that we should not take NRC's labels at face value. *See Brodsky*, 578 F.3d at 182 ("Whether the challenged order is an exemption, as the NRC has labeled it . . . or is properly regarded as an amendment . . . is itself an issue that is within our jurisdiction."); *Honeywell*, 628 F.3d at 575–76 (noting the exemption was memorialized as an amendment to a license condition); *Public Watchdogs*, 984 F.3d at 760–61 (analyzing the challenged action to determine that claimed exemption decisions were actually related to a prior license amendment).

preliminary, ancillary, or incidental to the "core issue" of a license proceeding. *Lorion*, 470 U.S. at 743.

**B.**

Applying our case-by-case approach here, we note the highly unusual circumstances of this case. PG&E apparently had every intent to decommission the Diablo Canyon facility and had even taken steps to do so. But for the California Legislature's determination of a material change in the electrical needs of its citizens, by all accounts PG&E would have terminated operations at Diablo Canyon. The high demands on electricity faced by Californians were caused by unexpected harms to power transmission capabilities by wildfires, the impacts of drought on hydropower, and increasingly frequent extreme heat events. In response to these changing needs, California found that the continued operation of Diablo Canyon was necessary. However, that determination came too late for PG&E to qualify for timely renewal status under NRC's five-year filing deadline. Indeed, it came at a date when there was almost certainly insufficient time for NRC to review a renewal application before the expiration of Diablo Canyon's current licenses. These are unique circumstances.

The practical impact of the Exemption Decision undermines NRC's arguments that the decision is simply an administrative scheduling change, one that merely provides an alternative deadline to file a license renewal application and does not impact the term of Diablo Canyon's existing licenses. Prior to the Exemption Decision, Diablo Canyon was scheduled to terminate operations for Units 1 and 2 by November 2, 2024, and August 26, 2025, respectively. After the Exemption Decision and the grant of timely renewal status, Diablo Canyon will operate until some indefinite

future date. Based on NRC's own guidance documents indicating an average 18-month application review period, that indefinite future date is almost guaranteed to be after the current expiration date of least one of the licenses. In that way, the Exemption Decision has modified the terms of the licenses. An NRC decision that has the almost certain effect of allowing for operation of a facility beyond its license period must be considered ancillary or incidental to "the core issue" of a license.

Nevertheless, NRC argues that unlike the denial of a hearing in *Lorion*, the Exemption Decision is not "the first step in a process that will . . . culminate in full formal proceedings under [§ 2239(a)(1)]" as it does not require PG&E to submit a license renewal application or impact the availability of a formal proceeding should such an application be submitted. *See* 470 U.S. at 729. However, while the Exemption Decision does not legally trigger the renewal proceeding in the way a citizen petition could have triggered a proceeding in *Lorion*, the practical consequence of the Decision was to facilitate PG&E's license renewal process and it is therefore incidental the renewal proceeding. We do not read *Lorion*'s application of "basic principles respecting the allocation of judicial review of agency action" to turn on the formal legal relationship between two proceedings. 470 U.S. at 746. Additionally, NRC's argument focuses on *Lorion*'s forward-looking analysis regarding a future proceeding while ignoring the impact on the license that already exists. *See General Atomics*, 75 F.3d at 539 (finding jurisdiction over an NRC action that would impact the existing license by determining if a company was a *de facto* licensee); *Public Watchdogs*, 984 F.3d at 758–59 (determining there was jurisdiction over an NRC decision

related to implementation of an existing license and related amendment).

Under the NRC's approach, Petitioners would challenge the Exemption Decision in district court. NRC also suggests that Petitioners could file a citizen petition under 10 C.F.R. § 2.206 to challenge the legality or safety of operations during timely renewal. But these arguments support our determination that the Exemption Decision fits within our Hobbs Act jurisdiction. *See Public Watchdogs*, 984 F.3d at 761–63 (noting in support of its finding of Hobbs Act jurisdiction that the petitioners there could have brought (and later did bring) the same challenge under a § 2.206 petition). Requiring Petitioners to bring this current petition in district court but later allowing them to challenge a § 2.206 petition on the same issues in the Ninth Circuit would lead to the "'seemingly irrational bifurcated system' where the court of review would be determined by the 'procedural particulars of the [NRC] action' rather than the 'subject matter of the [NRC] action.'" *Id.* at 763 (alterations in original) (quoting *Lorion*, 470 U.S. at 739, 742). The additional policy rationale articulated in *Lorion* further bolsters our decision. District court proceedings could not aid us in evaluating the agency's action. *Lorion*, 470 U.S. at 743–44 ("The factfinding capacity of the district court is . . . typically unnecessary to judicial review of agency decisionmaking."). Rather, review in the district court would create duplication of judicial effort and delay resolution, defeating the purpose of informal proceedings before an agency. *Id.* at 742.

In the unique context of this case, where the timing of NRC's decision has the almost guaranteed practical impact of extending operations at Diablo Canyon—impacting both implementation of the existing license and the progress of the license renewal proceeding—we hold that the Exemption

Decision is fairly considered as ancillary or incidental to the "core issue" of the existing Diablo Canyon license under the required broad reading of our Hobbs Act jurisdiction.

## III.

Having determined that we have jurisdiction to hear this petition on direct appeal, we next address NRC's arguments that Petitioners lack Article III standing to bring this suit.

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Article III standing is required at all stages of the litigation. *See United States v. Viltrakis*, 108 F.3d 1159, 1160 (9th Cir. 1997) ("[T]he jurisdictional issue of standing can be raised at any time . . . ."). To establish standing, the plaintiff or petitioner must show that an injury-in-fact was caused by the challenged conduct and can be redressed by a favorable judicial decision. *Phillips v. U.S. Customs & Border Protection*, 74 F.4th 986, 991 (9th Cir. 2023) (citing *Lujan*, 504 U.S. at 560–61). The party invoking federal jurisdiction (here, Petitioners) has the burden to establish standing. *Lujan*, 504 U.S. at 561. Each Petitioner can establish standing by showing at least one of its members would have standing. *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (standing of an organization is derivative of the standing of its members).

NRC argues that Petitioners have failed to show injury-in-fact.[7] Injury in fact requires a showing of harm that is

---

[7] In briefing before this court, NRC also originally argued the case was not ripe because timely renewal protection would not vest until (1) PG&E submitted a renewal application and (2) NRC approved the

actual and imminent. *Lujan*, 504 U.S. at 560. To show future harm, Petitioners must allege an injury that is "certainly impending, or there must be a substantial risk that the harm will occur." *Phillips*, 74 F.4th at 991 (cleaned up). According to NRC, Petitioners raise only the speculative possibility of future risks of natural disaster or operational accident at the Diablo Canyon facility as there will be no changes in the way Diablo Canyon operates. However, NRC recognized that age-related degradation of nuclear facilities may lead to safety and environmental risks beyond the initial 40-year license term that are different than those considered at the time in which the initial license was evaluated. Based on NRC's own guidance documents providing an average 18-month application review period and Diablo Canyon's current expiration dates, the likelihood of at least one of Diablo Canyon's nuclear power units continuing operations past its initial 40-year license term is almost guaranteed, not speculative. *See Nat. Res. Def. Council v. U.S. EPA*, 735 F.3d 873, 878 (9th Cir. 2013) (noting "probabilistic harm" may be considered "actual or imminent" when "there is a 'credible threat' that the probabilistic harm will materialize"). This is not a situation in which multiple steps are required before the alleged harm may come into being. *See e.g.*, *Munns v. Kerry*, 782 F.3d 402, 409–10 (9th Cir. 2015) (finding plaintiff's alleged harm was too speculative when it required him to be hired, sent to Iraq, have a government policy reinstated, and be kidnapped); *South Carolina v. United States*, 912 F.3d 720, 727–28 (4th Cir. 2019) (noting harm was too speculative given the multiple

---

application for docketing. However, NRC has acknowledged that both conditions have since been met and that the Diablo Canyon licenses are now in timely renewal status. Therefore, ripeness is not at issue.

steps that needed to happen before South Carolina became a repository for nuclear storage).

Additionally, NRC concedes that persons living within a 50-mile radius of a nuclear power facility face a realistic threat of harm should there be a release of radioactive materials from the facility. *See Calvert Cliffs 3 Nuclear Project, L.L.C. and Unistar Nuclear Operating Servs., L.L.C.*, 2009 WL 3297553 at *2–3 (Oct. 13, 2009 N.R.C.) (applying a "proximity presumption" to find injury-in-fact).[8] Mothers for Peace and Friends of the Earth have each alleged at least one of their respective members live, work, and own property within 50 miles of Diablo Canyon. [9] To summarize, Mothers for Peace and Friends of the Earth have (1) alleged a non-speculative potential harm from age-related safety and environmental risks, (2) shown that under the Exemption Decision, Diablo Canyon will in all likelihood continue operations beyond its initial 40-year license term while NRC completes review of a license renewal application, and (3) alleged members' proximity to the facility. The harm does not "lie[] at the end of a 'highly attenuated chain of possibilities,'" *South Carolina*, 912 F.3d

---

[8] At least two circuits have similarly recognized this potential injury from proximity to nuclear facilities. *See Shoreham-Wading*, 931 F.2d at 105 (noting the organization was suing on behalf of members that live in the area of the facility and finding standing to challenge an exemption decision); *Rockford League of Women Voters v. U.S. Nuclear Regul. Comm'n*, 679 F.2d 1218, 1221–22 (7th Cir. 1982) (noting members who live near enough to a facility to be endangered should the facility be unsafe had standing to pursue a proceeding).

[9] Because we find that Mothers for Peace and Friends of the Earth have standing based on the standing of their members, we have Article III jurisdiction to hear this case. No party specifically addressed the organizational standing of the Environmental Working Group, so we decline to address it here.

at 727 (citation omitted), but is rather a "credible threat" that qualifies as an actual and imminent harm, *Natural Resources Defense Council*, 735 F.3d at 878.

We easily find Petitioners meet the remaining requirements of standing, which NRC does not challenge. Petitioners' injury from the continued operation of Diablo Canyon is directly caused by NRC's approval of the Exemption Decision, and reversal of that Decision would redress the harm by eliminating Diablo Canyon's timely renewal status and thereby forcing operations to cease at the end of the license term. *See Lujan*, 504 U.S. at 560–61 (discussing causation and redressability requirements.).

## IV.

Having established both our jurisdiction and Petitioners' Article III standing, we turn to the merits of Petitioners' challenge. Petitioners assert that both the Exemption Decision and the related NEPA categorical exclusion are unauthorized by law and not supported by substantial evidence.

## A.

Review of agency action under the Hobbs Act is governed by the familiar APA standard—a court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Public Citizen v. U.S. Nuclear Regul. Comm'n*, 573 F.3d 916, 923 (9th Cir. 2009). An agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect

> of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The scope of review is narrow and does not allow a court to substitute its judgment for that of the agency.  *Id.*  The court should consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (citation omitted).  "Where scientific and technical expertise is necessarily involved in agency decision-making . . . a reviewing court must be highly deferential to the judgment of the agency.  *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1174 (9th Cir. 2004).

Petitioners argue the Exemption Decision is unauthorized by law because NRC made the decision without following statutory requirements for public hearings, safety findings, and NEPA compliance that attach to a license amendment or renewal.  These arguments are premised on the assumption that the Exemption Decision should be considered a renewal or amendment of Diablo Canyon's existing licenses.  However, such a characterization is incorrect.  While we have found that the decision is ancillary or incidental to a licensing proceeding for the purposes of our jurisdiction, there is a difference between an *action that is ancillary* to a proceeding and the *actual proceeding*.  As the Supreme Court noted in *Lorion*, NRC must sometimes undertake "summary or informal procedures" which do not require "detailed formal

consideration or . . . a hearing on the record." 470 U.S. at 742–43. We draw a distinction here between a decision that is ancillary and incidental to a proceeding (such that it confers jurisdiction under the mandated broad interpretation of the Hobbs Act) and the actual license proceeding itself (to which full procedural requirements attach).

Therefore, we reject Petitioners' arguments. There is no violation of 42 U.S.C. § 2133(c) (limiting the license term to 40 years) because NRC's action was not in itself a license amendment proceeding (even though it was ancillary or incidental to licensing). For the same reason, NRC was not required to provide a public hearing under 42 U.S.C. § 2239(a)(1), make assurances that it would complete the license renewal review before the license expired, make findings related to public safety, or complete an environmental impact statement under 10 C.F.R. § 51.95(c).

Petitioners next argue the Exemption Decision violates or implicitly revokes NRC's timely renewal rule (10 C.F.R. § 2.109(b)) thereby rendering the Decision unlawful, as well as arbitrary and capricious. More specifically, Petitioners argue that the purpose of the rule is to provide a reasonable amount of time to complete review of renewal applications before the license expiration date, which the rulemaking history and past exemption decisions have shown to be a minimum of three years. Yet here, argue Petitioners, NRC did not commit in any way to completion of either environmental review or a hearing process before Diablo Canyon's licenses expire. Additionally, insist Petitioners, the rationale that NRC oversight will ensure adequate health and safety measures is inconsistent with NRC's previously adopted statements that nuclear reactors operating beyond the 40-year license term raise unique safety concerns.

Petitioners argue that by its action here NRC has implicitly repudiated that rationale.

These arguments are not persuasive. The prior NRC exemptions to the timely renewal rule referenced by Petitioners are inapposite as those exemptions were granted because of a different special circumstance—that "[a]pplication of the regulation in the particular circumstances would not serve the underlying purpose of the rule or is not necessary to achieve the underlying purpose of the rule." 10 C.F.R. § 50.12(a)(2)(ii). To make the required special circumstances finding in those prior exemptions, NRC needed to explain why a shortened review period would still serve the purposes of the rule (i.e., providing adequate time for agency review prior to the expiration of the licenses at issue). Here, the Exemption Decision relies on a different special circumstance—that there are "other material circumstance[s] not considered when the regulation was adopted for which it would be in the public interest to grant an exemption." *Id.* § 50.12(a)(2)(vi). NRC is of course required to, and did, explain its decision, but deviation from the rationale supporting past decisions is not an implicit repudiation or repeal of the timely renewal rule; rather, it is a logical outcome when addressing the different circumstances presented by different exemption requests.

Additionally, to the extent Petitioners argue that the exemption ignores the unique environmental concerns of continued operations past the initial 40-year license term, they fail to present any specific evidence of concerns with Diablo Canyon. And as previously discussed, the Exemption Decision does not, in itself, commence a licensing renewal proceeding and therefore does not require the same level of environmental review or a hearing process.

Beyond these contentions of legal error, Petitioners also argue that the Exemption Decision is not supported by the record. First, regarding NRC's finding of no undue risk to the public health and safety, Petitioners argue PG&E failed to provide certain safety reports in the years following the withdrawal of the prior renewal application and therefore the record lacked information on maintenance activities and other environmental safeguards. This argument is insufficient to show the NRC decision is unsupported by the record. It is true that NRC's statements related to the continuing status quo of operation are somewhat contradictory to prior statements the agency made regarding the general concerns with age-related degradation in periods of extended operation beyond the initial 40-year licensing term. And the prompt review of safety issues promised by NRC may be hindered if PG&E has failed to provide certain safety reports in recent years when it was pursuing decommissioning. However, NRC's continuing oversight authority assuages safety concerns. *See, e.g.*, 42 U.S.C. § 2236(a); 10 C.F.R. § 50.100; 10 C.F.R. § 2.206(a). Furthermore, Petitioners do not identify any specific safety concerns with operations at Diablo Canyon. According to NRC, the process of review to implement any interim safety measures is consistent with its usual process upon submittal of renewal applications. *See* 10 C.F.R. § 54.30. In other words, while there are general concerns with the safety of aging nuclear plants, Petitioners offer no safety concerns specific to Diablo Canyon to be balanced against NRC's technical expertise in monitoring nuclear reactors, as well as its knowledge as to its staff's capabilities to review the renewal application. Given our deference to the technical expertise of the agency, *see Nat'l Wildlife Fed'n*, 384 F.3d

at 1174, we conclude the record is sufficient to support NRC's finding of no undue risk to public health and safety.

Arguments that NRC's finding of special circumstances is not supported by the record are similarly unavailing. PG&E's letter requesting the exemption fairly asserts that changes in California's needs for reliable electricity constitute circumstances not considered when NRC adopted the timely renewal rule. The California Legislature determined that extending Diablo Canyon's operations would be "prudent, cost effective, and in the best interests of all California electricity customers." While SB 846 does provide an off-ramp if costs become too expensive, it also directs PG&E to "take all actions that would be necessary to operate the powerplant beyond the current expiration dates." Even if Petitioners present alternative or contradictory interpretations of the legislation, NRC reasonably relied on the California Legislature's statements as to both the need for continued operation and the public interest.

Therefore, the Exemption Decision was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

**B.**

The same is true as to NRC's issuance of a NEPA categorical exclusion. Although NEPA generally requires an agency to prepare an environmental assessment or environmental impact statement for proposed actions that significantly affect the quality of the human environment, *see* 42 U.S.C. § 4332(C), actions that fit within a specified categorical exclusion do not require these steps. 40 C.F.R. § 1501.4. Categorical exclusions cover actions that the agency (through a rulemaking process) has determined do not have a significant effect on the human environment. 40

C.F.R. § 1507.3(e)(2)(ii). NRC has adopted certain categorical exclusions, *see* 10 C.F.R. § 51.22, one of which applies to exemption decisions assuming certain conditions are met.

"The [APA] sets the standards for our review of agency decisions under NEPA . . . . Under the APA, we set aside agency action only if we find it to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Mountain Communities for Fire Safety v. Elliot*, 25 F.4th 667, 674 (9th Cir. 2022) (quoting *Idaho Sporting Cong., Inc. v Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2022 (citing 5 U.S.C. § 706)). If an agency has reasonably determined that the activity in question falls within the scope of a categorical exclusion, its decision to invoke the exclusion is not arbitrary and capricious. *Id.* at 680; *see also Earth Island Inst. v. Muldoon*, 82 F.4th 624, 633 (9th Cir. 2023) (noting an agency satisfies NEPA with a categorical exclusion "so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious").

Pursuant to 10 C.F.R. § 51.22(c)(25), NRC found that the Exemption Decision qualified for a NEPA categorical exclusion. NRC explained why each criterion for exclusion was met (i.e., no significant hazards, no significant construction impacts or changes in the types or amounts of effluents, no significant increase in potential for radiological accidents, etc.), largely based on the fact that the Exemption did not alter the status quo at Diablo Canyon but simply allowed for a change in the schedule for submission of a renewal application. Petitioners argue NRC's reasoning is incorrect given (1) NRC's acknowledgment of unique safety and environmental risks from aging equipment, (2) this exemption was different from the types of exemptions mentioned as examples during the rulemaking for the NEPA

exclusion regulation, and (3) NRC incorrectly characterized the exemption as a procedural as opposed to a license extension that will expose the public to unevaluated accident risks.  Petitioners insist that NRC must complete an environmental impact statement to renew or amend the license.

We conclude that NRC's issuance of the NEPA categorical exclusion is supported by the record.  Despite Petitioners' arguments to the contrary, there is nothing in the language of the categorical exclusion that limits its use to certain types of exemptions. *See* 10 C.F.R. § 51.22(c)(25). Additionally, NRC historically has approved timely renewal exemption requests using the very same NEPA categorical exclusion.  As previously discussed, the Exemption Decision was not a license proceeding, and therefore a full environmental impact statement was not required.  Again, Petitioners do not present any arguments of specific safety concerns with Diablo Canyon but only reference NRC's general prior acknowledgement that operation after 40 years may present unique age-degradation concerns.

Therefore, NRC did not act arbitrarily or capriciously in invoking the NEPA categorical exclusion when issuing the Exemption Decision.

## V.

This is a singular case.  In circumstances like these where NRC's decision has the almost guaranteed practical effect of extending the operating timeframe of a license beyond its original expiration date, such a decision is directly reviewable in our court under our broad and liberal reading of the Hobbs Act.  Additionally, we hold that at least two of the Petitioners have standing. We deny the petition, finding NRC's grant of the Exemption and issuance of the NEPA

categorical exclusion complied with the APA.  NRC was not required to provide a hearing or meet other procedural requirements before issuing the Exemption Decision because the Exemption was not a licensing proceeding. NRC adequately explained why California's changing energy needs constitute a special circumstance, and why the record supported its findings of no undue risk to the public health and safety.  Despite Petitioners' arguments to the contrary, there are no limitations on the types of exemptions that may be encompassed by a NEPA categorical exclusion, and NRC did not act arbitrarily and capriciously in its determination that this Exemption met the eligibility criteria in its categorical exclusion regulation.

The petition is **DENIED**.